# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |
|---|---|
| **NVISION GLOBAL TECHNOLOGY SOLUTIONS, INC.,** | |
| **Plaintiff,** | |
| **v.** | **1:11-cv-0389-WSD** |
| **CARDINAL HEALTH 5, LLC,** | |
| **Defendant.** | |

## OPINION AND ORDER

This matter is before the Court on Cardinal Health 5, LLC's ("Defendant" or "Cardinal") Motion for Relief Under Rule 56(h) of the Federal Rules of Civil Procedure [192]; Cardinal's Motion for Partial Summary Judgment [143]; nVision Global Technology Solutions, Inc.'s ("Plaintiff" or "nVision") Motion for Partial Summary Judgment [148]; and nVision's Renewed Motion for Summary Judgment on Cardinal's Counterclaims of Fraud and Estoppel [206].

# I.    BACKGROUND[1]

## A.    Cardinal's 2007 Request for Proposal for Freight Payment and Audit Services

nVision was founded in 2003 as a software company to develop, sell, and lease logistics software used for freight bill payment and audit services.  (Def.'s Resp. and Objections to Pl.'s Statement of Material Facts ("PSOF") [61.3] ¶ 1).  Cardinal is a leading provider of medical, surgical, and pharmaceutical products and services, including wholesale distribution to retail customers such as drug stores, supermarket pharmacies, hospitals, and alternative care providers.  (Pl.'s Resp. to Def.'s Statement of Material Facts ("DSOF") [67] at 6).

In August 2007, Cardinal issued a "Request for Proposal" ("RFP") and solicited bids from companies to provide freight payment and audit ("FPA") services to some of Cardinal's business units.  (Def.'s Resp. and Objections to Pl.'s Statement of Material Facts in Support of its Mot. for Partial Summ. J. ("PSMF I")

---

[1] The Court relies upon the record evidence in this action, to include the statements of material fact that were submitted by the parties on their prior motions for summary judgment and those submitted in support of the instant motions.  See Reese v. Herbert, 527 F.3d 1253, 1270 (11th Cir. 2008); Prop. Mgmt. & Invs., Inc. v. Lewis, 752 F.2d 599, 604 n.4 (11th Cir. 1985).  This is necessary because the parties have omitted background information in their pleadings on the current motions that is necessary to understand the issues in dispute.

[157.1] at 2;[2] Pl.'s Resp. to Def.'s Statement of Material Facts as to Which There is No Genuine Issue to be Tried ("DSMF I") [171] at 2).  The successful bidder in the RFP process would provide FPA services to Cardinal that included auditing and paying invoices for carriers who delivered Cardinal's pharmaceutical and other products.  (DSMF I at 3).  Cardinal estimated that it cost approximately $1.2 million to perform FPA services "in-house" using its own resources and believed cost savings could be achieved by using an external FPA service provider.  (PSMF I at 4; DSMF I at 29-30).

The RFP specified the process for the company with which it would contract, including self-invoicing courier services to be provided by the successful bidder.  (DSMF I at 4-5).  This service was required to be designed to collect orders from customers and "group those orders under one shipment master record [for each delivery] so they rate as one charge [to Cardinal from a carrier] vs. getting assessed individual charges for each order [by carriers]."  (Id.).  This required the successful bidder to be able to accept Cardinal's customer information at an "order level," apply "grouping logic" to create a  single shipment at the "stop

_____

[2] The Court notes that the first and second pages of Defendant's Response and Objections to Plaintiff's Statement of Material Facts in Support of its Motion for Partial Summary Judgment do not contain page numbers, page numbering begins on the third page, and the page numbers are one number less than the actual page count.  The Court will refer to the document's actual page number, which is also listed by CM/ECF in the upper right hand corner, for ease of reference.

level," and generate a single "self-invoice" shipment master record, or freight bill, to facilitate payment to the carrier who delivered Cardinal shipments at the "stop level." (Id. at 9-10, 15-16). Thus, the end product of the self-invoicing courier service, according to the RFP, was a carrier freight bill or invoice[3] created from data processed at the order level, which was then transmitted to Cardinal's carriers. (Id. at 17-18, 45-46). The carrier picked up and delivered the shipment of aggregated invoices and was paid for the shipment service. Cardinal ultimately paid for all shipments.

The RFP stated that the successful bidder could expect to process 568,000 transactions under this courier, stop-specific, self-invoicing model each month. (Id. at 13-15). The RFP included a "pricing matrix" to be used by bidders for FPA services. (Id. at 18). Cardinal requested that all bidders insert into the pricing matrix the prices they would charge on a "per transaction" basis for each service. (Id. at 18-19). The RFP specified that "pricing was to be **inclusive** of audit, allocation, and reporting processes." (Id. at 19 (emphasis in original RFP)). The RFP also specified that if any other costs would be "require[d] to perform the services outlined in the RFP," bidders were to identify them in a table titled "Other Fees (please describe in detail)." (Id. at 21).

---

[3] Whether an invoice or freight bill was created for the shipment depended on which Cardinal business unit the shipment services were performed.

The RFP also asked bidders to distinguish between "float pricing" and "non-float pricing." (Id.). Float pricing referred to the prices a FPA provider would charge when it received advance funding from Cardinal to pay carriers. (Id. at 21-23). A FPA provider was able to earn interest ("float") on advanced funds until they were used to pay carriers for delivery of Cardinal's goods. (Id.). Because an FPA provider can earn interest on advanced funds, float pricing was understood to be generally lower than pricing based on the FPA provider using its own funds to pay carriers ("non-float pricing"). (Id.).

The RFP also permitted bidders to object to any of the conditions in the RFP, stating that a failure to object "shall mean that bidder agrees with, and will comply with the conditions set forth" in the RFP. (Id. at 23-24).[4]

---

[4] The Court notes nVision's objection to the consideration of the RFP as creating any binding obligation on the parties in light of the merger clause that was subsequently included in the LSA. The Court finds that the negotiations leading to the formation of the LSA are relevant regarding Cardinal's claim that there was a mutual mistake as to its material terms, specifically, the pricing of self-invoice courier services under the LSA. See Zaimis v. Sharis, 570 S.E.2d 313, 314 (Ga. 2002) (quoting Rasmussen v. Martin, 223 S.E.2d 663, 665 (Ga. 1976)) ("The doctrine of merger is applicable where there is no evidence of mutual mistake . . . but it should not be used to bar consideration of probative evidence offered to show an alleged mutual mistake in [a] reformation case."). nVision does not dispute the terms of the RFP or that the LSA was awarded based on nVision's response to the RFP.

B.    nVision's RFP submission

In August 2007, nVision submitted a response to the RFP and did not object

to any of the terms or conditions stated in it, to include those regarding the self-

invoicing courier service and pricing methodology.  (Id. at 25-26).  nVision did not

identify any other fees that it intended to charge to perform the FPA services

required by the RFP and specifically did not list "flat file data feed" fees or

"multiple line item data field" fees as fees nVision expected to charge to perform

services to Cardinal.  (Id. at 27-28, 50-51).  nVision stated in an email to Cardinal

that nVision's proposal included pricing for self-invoice courier transactions and

that self-invoicing services were considered equivalent to "EDI Small Package

Invoices."  (Id. at 34).[5]

Based on the nVision response to the RFP and its proposed pricing for

services detailed in the RFP, Cardinal estimated that nVision's annual billing

would be $180,000 less than the next-lowest bidder and $160,000 less than its $1.2

million internal cost to perform the same FPA services.  (Id. at 28-30; Pl.'s Resps.

and Objections to Def.'s Additional Statement of Facts ("DSAMF II") [223.1] at

54-55; PSMF I at 3-4).  nVision's initial internal estimates for its projected revenue

_____

[5] "EDI" stands for "electronic data interchange" and is a method through which
freight shipping carriers can share and transfer data in a standardized manner
between computer systems.

for providing FPA services to Cardinal were comparable and indicated that

nVision would earn $800,000 to $1.2 million annually in transaction fees.

(DSAMF II at 54; DSMF I at 31).

In October 2007, after responses to the RFP were submitted and evaluated,

Cardinal selected nVision to provide FPA services. (Def.'s Resp. and Objections

to Pl.'s Statement of Material Facts in Supp. of its Mot. for Summ. J. ("PSMF II")

[214.1] at 1-2; PSMF I at 5; DSMF I at 33).

C.      Contract negotiations between nVision and Cardinal

During late 2007 and early 2008, nVision and Cardinal engaged in

negotiations regarding the Logistics Services Agreement ("LSA"). (DSMF I at 33-

34). The lead negotiators for each side were Bill Pimpo ("Pimpo") for Cardinal,

and Luther Brown ("Brown"), nVision's CEO. (Id. at 39-40). The parties

exchanged multiple drafts of the LSA, and its associated pricing schedule. (Id. at

33-34; PSMF II at 2-7; PSMF I at 5-6). A merger clause in the LSA generally

provided that the LSA and its attached schedules represented the entire agreement

between the parties, superseded prior negotiations, agreements, contracts,

communications, or understandings and that the LSA could only be modified by a

writing signed by the parties. (DSMF I at 33-34; LSA § 11.7).

During contract negotiations in October 2007, Brown confirmed that the rate for EDI Small Package Invoices—which had been claimed by nVision to be equivalent to self-invoicing courier transactions—should be priced at $.025 for no-float, or non-funded, transactions and $.015 for float, or Cardinal advance-funded, transactions. (DSMF I at 34-36).

During negotiations in December 2007 and January 2008, the rate for non-funded self-invoice courier transactions was consistently listed as $.025 on drafts of the LSA. (PSMF II at 4; DSMF I at 36). With the exception of rates for self-invoice courier and self-invoice private fleet transactions, the funded rates for transaction fees in the pricing schedule were consistently listed at a rate lower than the non-funded rates for each different category of FPA services to be provided by nVision. (PSMF II at 2-7; PSMF I at 5-7; DSMF I at 36, 44-45).

On February 7, 2008, the draft of the LSA was revised by nVision and the proposed pricing schedule was transferred from a Microsoft Word document into a Microsoft Excel spreadsheet. (PSMF II at 4; DSMF I at 37). The new pricing schedule, which was prepared by nVision, failed to include pricing for self-invoice courier or self-invoice private fleet transactions. (PSMF II at 4; DSMF I at 37).

On February 8, 2008, Cardinal advised nVision of the omission of pricing for self-invoice courier and self-invoice private fleet transactions. (PSMF II at 4;

DSMF I at 37).  Brown notified Cardinal by email that the information would be added to the proposed pricing schedule.  (PSMF II at 4; Def.'s Resp. to Pl.'s Statement of Additional Material Facts ("PSAMF I") [193.1] at 2; DSMF I at 37).  Brown copied his assistant, Jennifer Shaeffer ("Shaeffer") on the email.[6]  (Id.).

On February 11, 2008, Shaeffer updated the pricing schedule with pricing information for self-invoice courier and self-invoice private fleet transactions and forwarded the updated document to Brown.  (PSMF II at 4; DSMF I at 38).  nVision's updated pricing schedule listed the rate for non-funded self-invoice courier transactions as $.025, but listed the price for funded self-invoice courier transactions, where nVision would have the benefit of earning daily interest on funds advanced by Cardinal, as $.20.  (PSMF II at 4; DSMF I at 38).  Shaeffer is unable to explain and cannot recall why the prices were entered on the pricing schedule on February 11th as $.025 for non-funded transactions and $.20 for funded transactions.  (PSMF II at 4; PSAMF I at 2-3; DSMF I at 38-39).[7]

_____

[6] Shaeffer is also referred to as Jennifer Shaeffer Whigham in various pleadings submitted by the parties.  Because the majority of documents in the record refer to her as Jennifer Shaeffer, the Court will refer to her as Shaeffer, instead of Whigham.

[7] Cardinal asserts that the $.20 price is an error that defies the logic of pricing at the float and no-float levels.  (DSMF I at 39).  The only evidence nVision offers for this price is Brown's affidavit statement that there was no mistake in the prices that were entered by Shaeffer and eventually incorporated into the LSA and that those

Cardinal claims that the parties did not discuss during the LSA negotiations between Brown and Pimpo a $.20 fee for self-invoice courier transactions. (PSMF II at 4; DSMF I at 40). nVision asserts, based on testimony offered by Brown, that $.20 was the correct figure reached during negotiations, that $.20 is a fee within the range of those submitted by other bidders, but that Brown cannot recall any specific conversation where this figure was discussed. (PSMF I at 3-4; PSAMF I at 7-8; DSMF I at 40-41). Brown acknowledges that if there had been conversations with Pimpo about a price of $.20 during the course of negotiations, "there would have been documents of some sort." (DSMF I at 41-42). Documents evidencing this price were not produced by either party during discovery.[8]

D.    The Logistics Services Agreement

On March 3, 2008, the parties entered into the LSA, which had a retroactive effective date of February 20, 2008. (PSMF II at 8-9; PSOF ¶ 9; DSOF at 7). The LSA states that "[a]ll pricing and rates for nVision's services to [Cardinal] are identified in Appendix A [(the "Pricing Schedule")]." (LSA § 5.1). The Pricing Schedule reflected a fee of $.025 for non-funded self-invoice courier transactions,

prices accurately captured nVision's intention to charge $.20 per funded self-invoice courier transaction. (Id.).

[8] nVision claims the executed LSA is the document that reflects their agreement on a price of $.20 for funded self-invoice courier transactions. (DSMF I at 41-42).

but listed the price for funded self-invoice courier transactions as $.20. (DSMF I at 38, 43-44; App. A to LSA).

The LSA stated that the annual baseline transaction volume for self-invoice courier transactions, which were transactions that produced a carrier freight bill, was 6,816,000. (DSMF I at 17-18, 45-46). The LSA does not provide for nVision to charge Cardinal for services associated with "flat file data feeds" or "multiple line item data fields." (Id. at 50).

Under the LSA, nVision processed payments to carriers who transported goods for Cardinal. (DSOF at 7-8). After nVision provided Cardinal with information regarding amounts owed to carriers for freight shipping services based on prior unpaid and new invoices, Cardinal forwarded funds to nVision for nVision to use to pay outstanding invoiced carrier amounts. (PSOF ¶ 167; DSOF at 15-16; LSA § 1.5).

The LSA made nVision's operating account (the "nVision Operating Account") the sole account into which funds provided by Cardinal would be deposited so they would be available to nVision to make payments to carriers Cardinal owed for shipping services. (PSMF II at 10; PSOF ¶ 92; DSOF at 44-45; Def.'s Resp. and Objection to Pl.'s Statement of Material Facts in Opp'n to Def.'s Early Mot. for Summ. J. ("PSOFIO") [74] ¶ 28; LSA §§ 1.1, 1.5). Section 1.5 of

the LSA required nVision to "submit a daily 'approve to pay' file to [Cardinal] identifying transactions due for payment" to carriers. (DSMF II at 12-13; LSA § 1.5). Cardinal was required to provide nVision with funds sufficient to pay to carriers listed in the "approve to pay" file. (Id.).

The LSA required nVision to issue payments on carrier invoices the same day nVision's bank received funding from Cardinal, provided that funding was received by 10:00 a.m. (DSOF at 25; LSA § 1.5). If funding confirmation was received later than 10:00 a.m., nVision was obligated to make payments on carrier invoices within 24 hours. (Id.).

E.  nVision's payments to carriers for self-invoice courier transactions and freight bills

In May 2009, nVision began administering Cardinal's PD Courier self-invoicing courier system. (PSMF II at 22). As described in the RFP and the LSA, nVision generated freight bills and invoices for deliveries made by Cardinal's carriers, using the PD Courier system. (Id. at 23-24). Based on these freight bills and invoices, each Monday, nVision notified Cardinal, using a "PD Weekly Report," how much Cardinal owed to carriers based on carrier invoices and freight bills. (Id. at 24). To request payment funds for freight bills that were not generated using the PD Courier system, nVision sent Cardinal a "Freight Payment Request." (DSAMF II at 4). The PD Weekly Report and Freight Payment

Requests were created by nVision and sent to Cardinal to advise it of the funding amount needed to be deposited into the nVision Operating Account to enable nVision to pay freight bills and invoices for shipments by Cardinal's carriers. (Id. at 4-8; PSMF II at 23-25).

The PD Weekly Report was sent by nVision to Cardinal by email with "PD Payment Due Report" in the subject field. (PSMF II at 25-26). The PD Weekly Reports generally were sent each Monday and included a spreadsheet listing all carrier invoices that had yet to be paid and new invoices created by the PD Courier system in the past week. (DSAMF II at 5, 8-9).

Freight Payment Requests sent by nVision to Cardinal contained headings that stated "Total Amount of US Freight Charges to Pay" owed to Cardinal's carriers and "Total Amount of Requested Deposit" from Cardinal to be paid into the nVision Operating Account to pay those freight charges. (PSAMF II at 7-8). nVision's Freight Payment Requests listed the Cardinal business representative to whom that request was addressed, listed the Cardinal business unit that received the carrier services, and identified the bank and account number of the nVision Operating Account into which deposits were to be made. (DSAMF II at 6).

Cardinal responded to the PD Weekly Report and Freight Payment Requests by forwarding, by electronic transfer, funds to be deposited into the nVision

Operating Account at least twice per week. (Id. at 4-8, 14-15; PSMF II at 27, 29).[9]

When Cardinal advanced funds for deposit into the nVision Operating Account to make payments on the freight bills and invoices reflected on the PD Weekly Report and Freight Payment Requests, a "Funding Request Email" was sent to nVision by Cardinal to specify how to apply funds to carrier invoices and Freight Payment Requests. (DSAMF II at 11-13; PSMF II at 27-28). Cardinal's Funding Request Emails specified how much was requested by nVision in the PD Weekly Report, indicated adjustments made by Cardinal based on its internal calculations and evaluation of errors, and stated the total adjusted amount that was forwarded to the nVision Operating Account for nVision to use to make payments to Cardinal's carriers pursuant to the PD Weekly Reports.[10] (PSMF II at 27). Cardinal also attached a Freight Payment Request spreadsheet to the Funding Request Emails that specified which carriers should be paid and in what amount pursuant to freight bills. (Id. at 26-29; DSAMF II at 11-13).

---

[9] Starting in March 2010, Cardinal provided funds in response to the PD Weekly Reports once per week. (PSMF II at 29).

[10] As a result of this process, Cardinal's funding did not always match the payment totals stated in nVision's PD Weekly Reports. (DSAMF II at 7; PSMF II at 26-27).

F.    Cardinal's identification of an issue with the Pricing Schedule

After the LSA was executed, but before nVision began providing FPA services, Cardinal's lead negotiator, Pimpo, noticed the price for funded self-invoice courier and funded self-invoice private fleet transactions was $.20 and $.18, respectively.  (PSMF II at 5; DSMF I at 42, 46-47).  Before the LSA was signed, no one at Cardinal noticed the prices for funded self-invoicing courier transactions was set at $.20.  (DSMF I at 43).

On March 12, 2008, Pimpo sent Brown an email (the "March 12th Email") noting this pricing discrepancy in the LSA Pricing Schedule.  (Id. at 42; PSMF II at 5; PSMF I at 8-9).  Pimpo's March 12th Email stated: "I was looking at the rate schedule and I noticed self-invoicing is $.025 on the final no-float column but it looks like we dropped a leading zero because the 1 day float shows $.20.  Sorry we missed that on the last rate copy."  (PSMF II at 5; Pl.'s Resps. and Objections to Def.'s Additional Statement of Material Facts ("DSAMF I") [191.1] at 8-10; PSMF I at 8-9).

On March 13, 2008, Brown forwarded Pimpo's March 12th Email to his assistant, Shaeffer, stating: "We need to discuss this and provide a corrected document to them and an amendment to address funding."  (PSMF II at 6; DSAMF I at 10-11; PSMF I at 9).

On March 14, 2008, after receiving Brown's email, Shaeffer amended the Microsoft Excel spreadsheet to reflect a price for funded self-invoice courier and funded self-invoice private fleet transactions of $.020 and $.018, respectively. (DSAMF I at 11-12; PSMF I at 9). Shaeffer saved this document as "Appendix A – Cardinal Health pricing matrix FINAL 03.14.08.xls." (DSAMF I at 11-12; PSMF I at 9).

Cardinal claims Pimpo discussed this matter with Brown on the telephone after sending the March 12th Email. (PSMF II at 5; PSMF I at 8-9; DSMF I at 42). Cardinal claims that during this telephone conversation, Brown acknowledged that the $.20 and $.18 prices were mistakes, and the result of typographical errors, and the prices should be $.02 and $.018, respectively, for funded self-invoice courier and funded self-invoice private fleet transactions. (PSMF II at 5; DSMF I at 47). Cardinal further claims that it took Brown at his word that the prices were corrected and did not seek a written acknowledgement of the mistake. (DSMF I at 47). nVision asserts that Brown did not have a conversation with Pimpo in which Brown acknowledged that the $.20 and $.18 figures were typographical errors. (Id.). It is undisputed that after March 12, 2008, and nVision began providing services, nVision charged Cardinal for funded self-invoice courier transactions at

the rate of $.02 and did not claim this transaction rate was .$20 until November 2010.  (Id. at 47-48).

In December 2008, nVision's Senior Vice President of Finance, Charlotte Sanders ("Sanders"), sent an email to Brown with a spreadsheet that identified "the Cardinal contract pricing" for self-invoice courier transactions as $.02.  (DSAMF I at 13-14).  In August 2009, Sanders forwarded to a prospective client a Pricing Schedule that she claimed was part of the "final Cardinal Health Agreement" that listed the rate for self-invoice courier transactions as $.02.  (Id. at 16-17).  In August 2009, another nVision employee, Keith Snavely, sent a pricing schedule to the same prospective client that listed the rate nVision would charge for self-invoice courier transactions as $.02, claiming this rate was identical to what nVision charged to Cardinal.  (Id. at 17-18).  In July 2010, Sanders also presented a spreadsheet to Brown that identified the "current rate" for self-invoice courier transactions being charged to Cardinal as $.02.  (DSMF I at 49).

G.     The dispute over nVision's charging of fees under the LSA

In October 2008, nVision started charging Cardinal for services associated with "flat file data feeds" and "multiple line item data fields."  (Id. at 52-54; DSAMF I at 19-20; PSAMF I at 11-14).  nVision claimed that "flat file data feed" services did not relate to carrier invoices or the production of freight bills, but to

the transmission of data between nVision and Cardinal in the course of its providing FPA services. (DSMF I at 52-53). nVision claims it was entitled to charge for this service irrespective of the LSA terms. (Id.). nVision asserted that "multiple line item data field" services related to a requirement to enter data into multiple data fields in processing transactions. (Id. at 52-54; PSAMF I at 12-13). These asserted fees were not provided for under the LSA, and they were unilaterally added to billing sheets sent to Cardinal by nVision. (PSAMF I at 13-14; DSMF I at 54).

In 2009, nVision also began charging Cardinal for the generation of data reports, computer services, and the implementation of software features that Cardinal requested from nVision employees. (PSMF I at 15-20, 37-41; PSAMF I at 8-11).

In September 2009, Cardinal disputed nVision's billing for fees for "flat file data feeds," "multiple line item data fields," and the generation of data reports. (PSAMF I at 10-11, 13-15, 17; DSMF I at 54-55). Pimpo sent Brown an email stating that these charges were not separate costs and were not allowed to be billed pursuant to the LSA. (PSAMF I at 18-19). Cardinal refused to pay billing sheets issued by nVision which included a charge for these services. (Id. at 10-11, 15-19; PSMF II at 30-32, 43; PSMF I at 15-17, 30-33, 35-45, 59, 66; DSMF I at 54-55).

nVision refused to remove these disputed charges from its bills because it asserted it was entitled to charge, and Cardinal owed, for these additional services even though they were not included in the LSA as services for which Cardinal agreed to pay. (DSAMF II at 47-48; PSMF II at 31-32, 45; PSMF I at 15-20, 30-33, 35-45, 59, 66; PSAMF I at 15-17).

After September 2009, when Cardinal ceased paying nVision's billing statements that included the disputed services, nVision and Cardinal negotiated for more than a year to resolve this billing dispute and to possibly extend the LSA. (PSMF II at 45-47; PSMF I at 66; DSMF I at 55). During negotiations, nVision continued to bill Cardinal at the rate of $.02 per funded self-invoice courier transaction, which totaled 7.78 million transactions in an amount of $155,596. (DSMF I at 47-48).[11]

H.    nVision's issuance of corrected bills

On August 2, 2010, Brown stated in an email to Sanders that he felt that nVision had "reached a point of possibly not accepting what [Cardinal] want[s] to offer which means we simply tell them we are going to stop processing and we are going to turn it over to our attorneys to collect our money[.]" (PSAMF II at 23).

---

[11] nVision claims charges at the rate of $.02 per self-invoice courier transaction were erroneous and occurred when Sanders relied, when preparing billing statements, upon the spreadsheet prepared by Shaeffer on March 14, 2008, instead of the original Pricing Schedule from the LSA. (DSAMF I at 5-7, 15-16).

Brown stated that nVision took the position in the billing dispute that Cardinal owes nVision for development costs and that the bills for the PD Courier self-invoice courier system "is about 6 times what [nVision] has billed [Cardinal]." (Id. at 23-24).

One month later, in September 2010, nVision claims that it realized that it had been billing Cardinal at the wrong rate when Sanders compared billing sheets that nVision had previously issued to Cardinal to the Pricing Schedule from the LSA. (DSAMF I at 6-7). Upon learning of this alleged billing error, Sanders claims she informed Brown, in person. (Id. at 7). Beyond Sanders' testimony at her deposition, there is no documentary or other evidence that confirms that Sanders discovered this error in September 2010, or that she notified Brown. (Id. at 6-7). Although nVision claims that it noticed this significant billing error in September 2010, it did not notify Cardinal then or during October 2010. (Id.).

On October 27, 2010, Brown sent a list of items to Cardinal that he wanted Cardinal to address to settle the issue of past due invoices owed to nVision, and the bills that were disputed. (PSAMF I at 25-26). Cardinal did not address Brown's extensive list of items, forwarding instead an agenda for discussion and requesting to schedule a meeting between the parties. (Id. at 26).

On November 3, 2010, after negotiations to resolve the billing dispute failed, nVision sent Cardinal "corrected bills" for the prior sixteen (16) months. (Id. at 19-23, 32-33; PSMF II at 32; DSMF I at 56). In these "corrected bills," nVision asserted that: (1) a billable transaction under the self-invoice courier process included every order from Cardinal's customers processed by nVision, instead of each stop by a carrier based on an issued freight bill; and, (2) the fee for every transaction was $.20, not the $.02 that nVision had been charging. (PSMF II at 32; DSAMF I at 18-19; PSMF I at 18-19, 35-37; DSMF I at 56-57). This "recalculation" by nVision resulted in an increase in nVision's billing for self-invoice courier transactions over the prior sixteen (16) months from $155,596 to more than $11.5 million dollars—a seventy-three fold increase.[12] (DSMF I at 56). These new bills asserted, for the first time, nVision's claim that transactions were based on orders and not stops. Previously, nVision had always billed per stop.

I.    The parties' negotiations to resolve the billing dispute

On November 12, 2010, representatives from nVision and Cardinal met again to try to resolve the billing dispute. (PSMF I at 49-50; PSAMF I at 27). In these discussions, nVision sought a new, six-year service agreement. (PSAMF I at

---

[12] Under nVision's "corrected" formula, nVision claims that Cardinal presently owes $23,435,802.74 for services rendered as of March 10, 2011. (PSMF II at 40). Cardinal disputes this amount and asserts that it includes charges in excess of $19.5 million that are not permitted under the LSA. (Id. at 42).

19-23; DSMF I at 57-58; PSOF ¶¶ 134-135, 138; PSOFIO ¶ 84).  At the November 12, 2010, meeting, Cardinal acknowledged that nVision was entitled to compensation for its services, but informed nVision that it should consider all bills disputed as to the amounts nVision invoiced because Cardinal disputed items on every invoice that nVision submitted.  (PSMF II at 48; PSMF I at 49-50, 67; PSAMF I at 27-28).  The parties agreed to conduct additional settlement discussions in January 2011.  (PSMF I at 53; PSAMF I at 28).

From January 24, to January 26, 2011, the parties held additional meetings (the "January Meetings") to resolve the service fee dispute.  (DSAMF I at 29-31; PSAMF I at 28-29; PSOF ¶¶ 136, 140-144, 149; DSOF at 42-43; Pl.'s Resps. and Objections to Def.'s Additional Statement of Material Facts ("DASOF") [78.1] at 2-3; PSOFIO ¶ 147).  At the January Meetings, Cardinal informed nVision that it would not agree to a contract with a term longer than two (2) years.  (PSMF II at 50, 53-54; PSMF I at 53-54, 57-58; PSAMF I at 28-29).  nVision's representatives told Cardinal that after consulting with Brown on the results of the January Meetings, it would advise Cardinal on January 31, or February 1, 2011, whether nVision would enter into a two-year contract.  (PSMF II at 52-55).

On January 26, 2011, Brown decided to suspend all FPA services, to seize all advance funds in the nVision Operating Account that had been deposited by Cardinal, and to initiate this litigation against Cardinal. (Id. at 57-58).

J.     nVision's accrual of excess funds in the nVision Operating Account in anticipation of the January Meetings

After PD Courier began operating in May 2009, nVision initially paid a number of Cardinal's carriers' invoices from the nVision Operating Account before Cardinal advanced funds pursuant to nVision's requests for funding in the PD Weekly Reports and Freight Payment Requests. (Id. at 29). In September 2009, Cardinal began advancing excess funds into the nVision Operating Account in anticipation of the upcoming PD Weekly Report to ensure that nVision always had sufficient funds on hand to pay Cardinal's carriers without delay when carrier delivery invoices and freight bills were received. (Id. at 21-22).[13] Cardinal advanced funds only for nVision to use to pay Cardinal's freight carriers. (Id.). Cardinal would not have advanced funds to nVision if it knew that "nVision did not intend to make carrier payments as represented in the funding requests." (DSAMF II at 9).

_____

[13] This overfunding practice had the residual benefit of allowing nVision to benefit from a larger account balance on which it could earn daily interest.

In August 2010, as the billing dispute escalated, nVision considered

terminating services to Cardinal and seizing any excess Cardinal funds in the

nVision Operating Account to satisfy what it asserted were fees owed to it by

Cardinal.  (PSMF II at 34).  On August 2, 2010, Brown sent an email to nVision's

Senior Vice President of Finance, Sanders, which stated:

> I feel we have reached a point of possibly not accepting what
> [Cardinal] want[s] to offer which means we simply tell them we
> are going to stop processing and we are going to turn it over to
> our attorneys to collect our money? . . . When we do this they
> will no longer fund us and we need to know the impact of that?
> Yes we know we will file suit and immediately hold all funds up
> to what they owe us?

(Id.; DSAMF II at 23-24).

In November 2010, Cardinal realized that it had advanced excess funds into

the nVision Operating Account in an amount that totaled approximately $14

million, which was sufficient to pay carriers for four to five weeks of services.

(DSAMF II at 17-18; PSMF II at 34).

In December 2010, Cardinal notified nVision that it possessed "significantly

more cash on account than . . . required to fund the carriers" and requested that

nVision apply the excess funds to invoices before requesting additional funding for

the nVision Operating Account, stating further that nVision should have funds

sufficient only for "2-4 days of float for all business with the exception of PD

[Courier] which should be approximately a week." (DSAMF II at 19-20; PSMF II at 34, 39).

By the end of December 2010, the excess funds in the nVision Operating Account had been reduced to an amount that was sufficient to pay carriers for one to two weeks of services. (PSMF II at 34).[14]

On January 3, 2011, Cardinal's representative, Michael Berg, emailed nVision executives Brown, Sanders, Moe Galante ("Galante"),[15] and Robert Lloyd ("Lloyd")[16] and stated: "As we look at cash management practices it doesn't make sense to have more than a week of funding by business unit especially given the [LSA]." (DSAMF II at 20-21).

During January 2011, mindful that Brown's plan to cease services envisioned in his August 2010 email to Sanders also involved seizing the excess advance funds from Cardinal in order to apply them to the disputed bills, nVision employees, particularly Sanders, sought to increase the amount in the nVision

---

[14] Between November 2010 and January 26, 2011, nVision's average weekly funding requests in the PD Weekly Reports for PD Courier were approximately $4 million. (PSMF II at 69).

[15] Galante is nVision's Vice President of Global Facilities. (PSMF II at 36).

[16] Lloyd is nVision's Senior Vice President of Operations. (DSAMF II at 51).

Operating Account. (PSMF II at 36-39).[17] This was contrary to Cardinal's

direction that nVision maintain only a minimum amount of excess advance funds

in the nVision Operating Account for the purpose of paying Cardinal's carriers.

(DSAMF II at 17-21; PSMF II at 34, 39).

In early January 2011, Sanders, the person at nVision in charge of making

payments to Cardinal's carriers, began updating Brown regarding how much

excess advance funding was in the nVision Operating Account. (DSAMF II at 32-

33; PSMF II at 35). To protect the excess funds in the nVision Operating Account,

Sanders proposed making payments to Cardinal's carriers during January 2011 that

were less than the amounts requested in the PD Weekly Reports. (DSAMF II at

32-33; PSMF II at 35-36). Brown approved Sanders' proposal, allowing nVision

to enlarge the excess funds in the nVision Operating Account. (DSAMF II at 32-

33; PSMF II at 35-36). nVision also began delaying payments to Cardinal's

carriers, which also resulted in excess funds accumulating in the nVision Operating

Account. (PSMF II at 37).

On January 6, 2011, while nVision had more than $12.5 million of Cardinal

funds on hand in the nVision Operating Account, Sanders proposed to Brown that

---

[17] Between September 20, 2010, and January 26, 2011, as nVision was deciding to terminate FPA services and commence litigation, nVision had regular contacts with its counsel. (DSAMF II at 56-57; PSMF II at 59-61).

nVision pay only $1.9 million in Cardinal carrier payments that week. (DSAMF II at 33-34). On January 10, 2011, while nVision had more than $9.3 million on hand in the nVision Operating Account, Sanders proposed that no payments be made to carriers. (Id. at 34-35). On January 12, 2011, while nVision had more than $11 million on hand in the nVision Operating Account, Sanders proposed making payments to carriers of only $772,000 to ensure there was an end of week balance in the nVision Operating Account of $15.9 million. (Id. at 35-36).

These accounting actions by nVision resulted in a significant increase in the amount of excess advanced funds in the nVision Operating Account prior to the January Meetings. (PSMF II at 35-36).

K.   nVision's conduct and statements to Cardinal leading up to the
     January Meetings and nVision's termination of services

On January 8, 2011, Galante, nVision's Vice President of Global Facilities, proposed that nVision cease providing any services to Cardinal and to apply the excess advanced funds in the nVision Operating Account to what nVision asserted were the "corrected" unpaid bills. (Id. at 36; DSAMF II at 25-26). On January 9, 2011, Galante also proposed to Sanders that nVision use inclement weather as an excuse for delaying payments to Cardinal's carriers. (DSAMF II at 28-29).

On January 10, 2011, Cardinal contacted an nVision employee, Jackie Moulder ("Moulder"), and asked nVision to explain why payments to its carriers

27

were nearly forty (40) days late.  (Id. at 27).  Moulder set up a conference call to discuss why payments to Cardinal's carriers were delayed.  (Id. at 27-28).  When Brown learned that Moulder had set up the conference call, Brown removed her from any participation in responding to the Cardinal delayed payment inquiry, and Brown, with Sanders, developed nVision's response to Cardinal.  (Id.; PSMF II at 37).  Brown and Sanders together considered whether nVision could "come up with a good reason for payments being late[.]"  (DSAMF II at 27-28; PSMF II at 37).  They agreed to use inclement weather as the excuse for delayed payments to carriers, and this excuse was communicated to Cardinal.  (DSAMF II at 27-28; PSMF II at 37).

On January 13, 2011, Brown realized that in light of increasing tension with Cardinal, nVision's "decision to stop everything [would] have to be made." (DSAMF II at 26-27; PSMF II at 36).  That same day, Brown and Sanders decided to stop sending payments to Cardinal's carriers—even though there were excess funds in the nVision Operating Account—until additional funding from Cardinal was deposited in response to Freight Payment Requests.  (DSAMF II at 29-30; PSMF II at 37).  They decided to blame these delays in payments to carriers on inclement weather.  (Id.).  Sanders emailed Brown and let him know that she told

Cardinal that inclement weather was the reason for late payments. (DSAMF II at 29-30; PSMF II at 37-38).

On January 13, 2011, Galante told Brown that nVision should avoid doing anything in the course of negotiations with Cardinal over the billing dispute that might result in Cardinal electing to cease depositing additional funds into the nVision Operating Account to pay carriers. (DSAMF II at 36-37; PSMF II at 36-37).

Also on January 13, 2011, Sanders informed Brown of her plan to induce Cardinal to transmit additional excess advance funds into the nVision Operating Account by under-representing the amount of funds nVision had on hand to pay Cardinal's carriers and to misrepresent when funds to pay carriers would run out. (DSAMF II at 30-31; PSMF II at 38, 71). Pursuant to the plan, Sanders misrepresented to Cardinal that nVision was in danger of running out of money to

pay Cardinal's carriers.  (DSAMF II at 30-31; PSMF II at 38).  Sanders reported to Brown that she had made this representation to Cardinal.  (Id.).[18]

L.    Cardinal's advancement of funds under the LSA during the January Meetings and nVision's termination of services

nVision continued to pay Cardinal's carriers during the January Meetings with funds that Cardinal deposited into the nVision Operating Account, but also undertook to increase the excess in the account.  (PSMF I at 66; PSOF ¶¶ 22, 27, 107, 117; PSOFIO ¶ 51).

On January 19, 2011, nVision requested Cardinal to deposit $273,511.73 into the nVision Operating Account to pay Cardinal's carriers.  (DSAMF II at 41-42; PSMF II at 72).

---

[18] The Court finds that the record supports that nVision sought to misrepresent the amount of funds in the nVision Operating Account and keep Cardinal from learning how much in excess advance funds nVision held.  The clearest example of this is an email from Sanders to Brown regarding her attempts to deny Cardinal information about the account balance in which she stated:

> Fyi . . . [Cardinal is] keeping a weekly tab on the PD balance.  I guess Chris [Hawke, a Cardinal representative,] is having someone pull the payments made each week so they are keeping a running balance.  Peter [Nguyen, another Cardinal representative,] mentioned it and also started asking me how we had paid so much this week as the balance should have been higher.  I talked him in circles, until I finally got the response of "ohhhh, ok" and he left it alone.

(DSAMF II at 32; PSMF II at 38, 71-72).

On January 20, 2011, it requested Cardinal to deposit an additional $234,761.73 and on January 21, 2011, it requested an additional $2,146,288.26 be deposited. (Id.).

On January 24, 2011, Cardinal, in response to nVision's funding requests, advanced $727,798.81 into the nVision Operating Account for nVision to make payments to its carriers. (PSMF II at 72-73).

Also on January 24, 2011, nVision forwarded a payment due report to Cardinal indicating the amounts owed to Cardinal's carriers and requesting Cardinal deposit $2,831,295.00 in the nVision Operating Account to pay the outstanding invoices. (DSAMF II at 41-42; PSOF ¶ 167). The next day, on January 25, 2011, nVision made a further deposit request in the amount of $773,041.36 ("January 25th Payment Due Report"). (DSAMF II at 41-42; PSMF II at 73-74; PSOF ¶¶ 159-160, 167; DASOF at 5-6).

On January 25, 2011, Cardinal, in response to nVision's funding requests of January 19th through 24th, advanced $5,248,181.74 into the nVision Operating Account for nVision to make payments to its carriers. (PSMF II at 73).

Although nVision received $5,975,980.55 in its Operating Account for the purposes of paying Cardinal's carriers between January 24th and January 25th, nVision only paid out $3,444,568 during the same time period. (Id. at 72-75).

On January 26, 2011, in response to the January 25th Payment Due Report, Cardinal deposited an additional $772,869.23 into the nVision Operating Account to pay Cardinal's carriers for transportation services. (Id.; PSOF ¶¶ 161, 167; DASOF at 3-6; Aff. of Charlotte A. Sanders ¶¶ 21-22).[19]

Late in the day on January 26, 2011, after the $772,869.23 was deposited into the nVision Operating Account, and after business hours, nVision suspended its services to Cardinal pursuant to Section 5.1 of the LSA, including by denying Cardinal access to nVision's software and by terminating Cardinal's access to its own transactional data, based on Cardinal's alleged non-payment of service fees for a period in excess of sixty (60) days. (DSAMF II at 38-39; DSAMF I at 29-31; DSMF I at 58-59; PSOF ¶¶ 152, 172; DSOF at 42-43; DASOF at 10-11; PSOFIO ¶ 52). When nVision suspended its services on January 26, 2011, nVision held $18,531,290.95 in undisbursed carrier funds in its Operating Account. (DSAMF II at 39-41; DSAMF I at 31-32; DSMF I at 59; DSOF at 43-44). These funds had been advanced by Cardinal to pay carriers to satisfy Cardinal's obligations on outstanding invoices. (Id.).

---

[19] The deposit of $772,869.23 was initiated on January 25, 2011, but was not finalized until January 27, 2011. (PSMF II at 74-75).

On January 27, 2011, the day after nVision ceased providing services to Cardinal, nVision filed this action in the Fulton County Superior Court. (PSMF II at 62; PSMF I at 67; PSAMF I at 30; DSOF at 43).

M.  Cardinal's post-termination actions

On January 28, 2011, the day after it was sued, Cardinal sent to nVision, pursuant to Section 8.2 of the LSA, its notice of a material breach of the LSA. (DSAMF I at 38-39; PSOF ¶ 179; DSOF at 54). Cardinal demanded access to its transactional data and confidential information held by nVision, which was necessary to determine how much it owed each of its carriers. (PSMF II at 65-66; DSAMF I at 36-39; PSOF ¶¶ 182-183; DSOF at 55-56; DASOF at 11).[20] Cardinal also demanded that nVision return all funds that had been advanced to it for payment to Cardinal's carriers. (DSAMF I at 39-40). nVision refused to return the advanced payment amounts.

---

[20] After January 26, 2011, nVision never restored Cardinal's access to nVision's systems. (DSAMF I at 40). In February 2011, nVision provided to Cardinal, Cardinal's transactional data in paper and electronic format, separated out from nVision's proprietary software or formats. (Id. at 30; PSMF II at 64-65; PSMF I at 67-69; PSOF ¶¶ 181-182; PSOFIO ¶¶ 107-109). Cardinal asserts that nVision's election to provide Cardinal's data in the paper and electronic format violated nVision's "obligation under Section 2 of the LSA to 'provide [Cardinal Health] access to all [Cardinal Health] data in nVision's systems for a period of no less than ninety (90) days from the termination or expiration date of this Agreement.'" (PSMF II at 64-65; PSMF I at 67-69; PSOF ¶ 182). The Court has previously ruled that nVision's failure to comply with Section 2 after termination constituted a breach of the LSA. (Order of Jan. 10, 2012, at 43-44).

Cardinal thereafter determined, based on its records, what it owed its carriers and paid those amounts from its own funds, even though nVision possessed funds that Cardinal previously had provided for these same payments. (Id. at 32-35; DSAMF II at 39-41; PSMF II at 65-66; PSOF ¶¶ 177, 183).

After nVision ceased providing services to Cardinal, Cardinal performed its own FPA services using its own software and a FPA software program it acquired by merger with another company in July 2010. (PSMF II at 66-67; DSMF I at 61-64).[21]

---

[21] The Court notes that nVision claims that Cardinal possessed and wrongfully used nVision's proprietary information and had access to changes and enhancements to nVision's software. nVision has not presented any factual information to dispute Cardinal's assertion that, after January 26, 2011, Cardinal did not use any of nVision's software programs and that the computer systems used by Cardinal were not derived from or based on any of nVision's information. (PSMF I at 71-79; PSAMF I at 33-37; DSMF I at 61-70). nVision has not identified with any degree of particularity what nVision trade secrets or other proprietary information Cardinal had access to, much less relied upon or used, in its FPA processing after nVision suspended services. (PSMF I at 71-79; PSAMF I at 33-35; DSMF I at 61-72). nVision's Director of Technology is unable to identify any Cardinal misappropriation of nVision's trade secrets or proprietary information after the termination of services. (DSMF I at 66-67). The Court finds that nVision has not properly disputed that Cardinal did not use nVision's software or proprietary information after January 26, 2011, and any objection to this fact is overruled. NDGa., LR 56.1. This claim by nVision of misuse of its alleged proprietary information and processes appears to have been unfounded and untrue.

N.     Procedural background

On January 10, 2012, the Court issued its Order (the "January 10th Order")

on the parties' first set of substantive motions, which included nVision's Motion

for Judgment on the Pleadings [18], Cardinal's Motion for Partial Summary

Judgment [42], nVision's Motion for Partial Summary Judgment [49], Cardinal's

Rule 56(d) Motion to Deny or Defer Ruling on Plaintiff's Motion for Partial

Summary Judgment Pending Further Discovery [65], and Cardinal's Motion for

Leave to File Declaration of Michael Berg Adding the Omitted Exhibits [81].

(Order of Jan. 10, 2012, at 1, 7).

In its January 10th Order, the Court: (1) denied nVision's Motion for

Judgment on the Pleadings [18] on Cardinal's claims for breach of contract,

conversion, fraud, constructive trust, bailment, unjust enrichment, equitable

reformation, punitive damages, and litigation expenses; (2) granted, in part,

Cardinal's Motion for Partial Summary Judgment [42];[22] (3) deferred awarding

damages for Cardinal based on the breach of contract by nVision pending a factual

determination of damages at trial; (4) denied nVision's Motion for Partial

Summary Judgment [49] on Cardinal's claims for fraud, constructive trust,

---

[22] Specifically, summary judgment was granted on Cardinal's breach of contract
claim, on nVision's claim for lost profits, and on nVision's claim for any expenses
that were billed to Cardinal more than 180 days after the expense was incurred.

conversion, and equitable estoppel; (5) permitted nVision to renew its motion for summary judgment on the fraud and estoppel claims by filing a motion for summary judgment on or before February 6, 2012; (6) granted Cardinal's Rule 56(d) Motion to Deny or Defer Ruling on Plaintiff's Motion for Partial Summary Judgment [65] on its fraud and estoppel claims; and, (7) granted Cardinal's Motion for Leave to File Declaration of Michael Berg Adding the Omitted Exhibits [81].

The January 10th Order did not decide the parties' Motions for Partial Summary Judgment [143, 148] and Cardinal's Motion for Relief under Rule 56(h) [192] that are presently before the Court. On February 6, 2012, nVision filed its Renewed Motion for Summary Judgment on Cardinal's Counterclaims of Fraud and Estoppel [206]. The Court now turns to the parties' second set of substantive and procedural motions.

## II. DISCUSSION

### A. Cardinal's Motion for Relief under Rule 56(h) [192]

On December 6, 2011, in documents provided to Cardinal by nVision, Cardinal discovered emails sent from Brown to Pimpo and from Brown to Brown's assistant, Shaeffer, after Pimpo raised questions in March 2008 about the pricing for funded self-invoice courier transactions and whether the Pricing Schedule could be amended to reflect a three-day float rate. In these emails, Brown told

Pimpo that he would consider amending the Pricing Schedule, and Brown then forwarded Pimpo's email about the pricing for funded self-invoice courier transactions to Shaeffer, stating: "We need to discuss this and provide a corrected document to them and an amendment to address the funding."

Around December 6, 2011, Cardinal also learned from documents provided by nVision that Shaeffer modified the spreadsheet containing the Pricing Schedule after receiving Brown's email and saved it with the title "Appendix A – Cardinal Health pricing matrix FINAL 03.14.08.xls." Cardinal also discovered documents that confirmed nVision priced its funded self-courier transaction fees for Cardinal at the rate of $.02 through September 2010 and that nVision represented to potential clients that it charged Cardinal a rate of $.02 for funded self-invoice courier transactions.

On December 7, 2011, Cardinal's counsel provided these emails and documents to nVision's counsel, and requested that nVision reassess its position with regard to Cardinal's mutual mistake and equitable reformation claims.

On December 8, 2011, nVision filed a second affidavit from Brown (the "Second Brown Affidavit") in support of nVision's Second Motion for Partial Summary Judgment [148] that: (i) attempts to explain the context of the emails provided by Cardinal's counsel to nVision's counsel; (ii) denies Pimpo's statement

that he had a conversation with Brown in which Brown admitted the price for funded self-invoice courier transactions should have been $.02; and, (iii) asserts that there was no error in the $.20 fee for funded self-invoice courier transactions on the Pricing Schedule.[23]

On December 27, 2011, after the parties had filed and fully briefed their two motions for partial summary judgment [143, 148], Cardinal filed its Motion for Relief Under Rule 56(h) of the Federal Rules of Civil Procedure [192] seeking an order: (1) striking the affidavits of Luther Brown [165, 184] that were filed in support of nVision's Second Motion for Partial Summary Judgment; and, (2) requiring nVision to pay Cardinal's reasonable costs and attorney's fees incurred in litigating its claim for equitable reformation and defense of mutual mistake.

Rule 56 of the Federal Rules of Civil Procedure, which governs motions for summary judgment, states that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Affidavits must also contain supporting facts demonstrating a basis for the affiant's claim that his

---

[23] On December 13, 2011, nVision filed a third affidavit from Brown (the "Third Brown Affidavit") that was substantially the same as the Second Brown Affidavit, but with insubstantial edits to two paragraphs.

statements are the product of his personal knowledge." Williams v. Great-West Healthcare, Civil Action No. 1:05-CV-2675-RWS-GGB, 2007 WL 4564176, at *5 (N.D. Ga. Jun. 8, 2007).

In Van T. Junkins & Associates, Inc. v. U.S. Industries, Inc., the Eleventh Circuit discussed the sham affidavit rule and held that a district court on a motion for summary judgment may properly disregard an affidavit which is a sham. 736 F.2d 656, 657 (11th Cir. 1984). "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." Id. The Eleventh Circuit found that the plaintiff's affidavit in Junkins was a sham because it conflicted directly with the answers plaintiff gave in a prior deposition. Id. at 659. The Junkins court held that the sham affidavit submitted by the plaintiff did not create a genuine issue of material fact which required resolution by a jury. Id.

To strike an affidavit as a sham, a court must find "some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit." Rollins v. TechSouth, Inc., 833 F.2d 1525, 1530 (11th Cir. 1987). "Thus, a party cannot create a genuine issue of fact sufficient to survive summary

judgment simply by filing an affidavit contradicting earlier deposition testimony." Johnson v. Louisville Ladder, Civil Action No. 07-764-KD-M, 2008 WL 5122261, at *5 (S.D. Ala. Nov. 14, 2008) (citing Tippens v. Celotex Corp., 805 F.2d 949, 954-55 (11th Cir. 1986)). "Such affidavits may be considered when the affidavit contains a satisfactory explanation of the contradictions between the affidavit and the affiant's earlier deposition testimony, or when newly discovered evidence furnishes a good faith basis for any inconsistency between the two." Id. (citing Clay v. Equifax, Inc., 762 F.2d 952 (11th Cir. 1985)).

Furthermore, "an affidavit may only be disregarded as a sham 'when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact.'" Bryant v. U.S. Steel Corp., 428 F. App'x 895, 896-97 (11th Cir. 2011); see also Rodriguez v. Jones Boat Yard, Inc., 435 F. App'x 885, 887 (11th Cir. 2011) (quoting Tippens, 805 F.2d at 954) ("[A]n affidavit may be stricken as a sham when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.") (internal quotation omitted). "[A] court must be careful to distinguish 'between discrepancies which create transparent shams and discrepancies which create an

issue of credibility or go to the weight of the evidence.'"  Faulk v. Volunteers of

Am., 44 F. App'x 316, 318 (11th Cir. 2011).

> [E]very discrepancy contained in an affidavit does not justify a
> district court's refusal to give credence to such evidence.  In light
> of the jury's role in resolving questions of credibility, a district
> court should not reject the content of an affidavit even if it is at
> odds with statements made in an early deposition.

Tippens, 805 F.2d at 954.

Rule 56(h) of the Federal Rules of Civil Procedure also states that:

> If satisfied that an affidavit or declaration under this rule is
> submitted in bad faith or solely for delay, the court—after notice
> and a reasonable time to respond—may order the submitting
> party to pay the other party the reasonable expenses, including
> attorney's fees, it incurred as a result.  An offending party or
> attorney may also be held in contempt or subjected to other
> appropriate sanctions.

Fed. R. Civ. P. 56(h).  Rule 56(h) generally permits a party to seek sanctions

against an offending party or attorney and reimbursement for its reasonable

expenses, to include attorney's fees, when an affidavit has been submitted in bad

faith or solely for delay, as well as when moving to strike a sham affidavit.  See

Fed. R. Civ. P. 56(h); United States v. Nguyen, 655 F. Supp. 2d 1203, 1208-09

(S.D. Ala. 2009); see also Modica v. United States, 518 F.2d 374, 377 n.2 (5th Cir.

1975); Barber v. Hallmark Cards, Inc., No. 93-4087-SAC, 1994 WL 568872, at *5-

*6 (D. Kan. Sept. 14, 1994); Acrotube, Inc. v. J.K. Fin. Grp., Inc., 653 F. Supp.

470, 478 (N.D. Ga. 1987). Where a court finds a party acted in bad faith or solely for the purposes of delay in submitting an affidavit on summary judgment, it may exercise its discretion to award attorney's fees or a sanction that includes striking an affidavit or holding a party in contempt. See Fed. R. Civ. P. 11, 56(h); Cobell v. Norton, 214 F.R.D. 13, 21-22 (D.D.C. 2003).

Here, the Court finds that Brown's Second and Third Affidavits are not required to be stricken pursuant to Rule 56(h) or the sham affidavit rule. Brown's testimony at his deposition[24] and in his Second and Third Brown Affidavits, while it may not be found credible, and while seemingly in conflict with the record evidence, are facially consistent with each other and seek to explain newly-discovered evidence. See, e.g., Tippens, 805 F.2d at 954; Johnson, 2008 WL 5122261, at *5.

---

[24] At Brown's prior deposition, he testified regarding Cardinal's claim that there was a mutual mistake on the Pricing Schedule and stated:

> Q: That's a typographical error, isn't it sir?
>
> A: No, sir, it's not.
>
> Q: Are you saying under oath that this is not a decimal point error like the other four or five that we looked at today?
>
> A: I am saying that this is what the parties agreed to, and it is not a typographical error.

There is also no clear evidence of bad faith or that the most recent affidavits have been submitted solely for delay by nVision. Fed. R. Civ. P. 56(h). The affidavits reflect the opinions of Brown and provide context to the newly-discovered nVision emails that Cardinal believes support its mutual mistake theory. These affidavits are not "flatly at odds with facts indisputably within [Brown's] knowledge" and nVision has not failed "to satisfy the standard of candor applicable to parties appearing before this Court" such that sanctions are appropriate. See Acrotube, Inc., 653 F. Supp. at 478; see also Warshay v. Guinness PLC, 750 F. Supp. 628, 639-40 (S.D.N.Y. 1990).

As nVision's CEO and lead negotiator of the LSA, what Brown perceived as the correct price for funded self-courier transactions and his perceptions regarding how he later communicated with persons on that topic are relevant to the claims at issue in this litigation. His affidavits were filed in support of these issues, support nVision's contention that there was no mutual mistake in the formation of the LSA, and rebut the manner in which Cardinal construes the email communications involving Brown by providing context to that correspondence. While the Court finds that the timing and content of these affidavits raises serious issues regarding the credibility and veracity of Brown's recollections and testimony, particularly in light of the record evidence when taken as a whole, the Court does not find there is

currently enough information available to conclude that the affidavits were filed in bad faith, solely for the purposes of delay, or that the affidavits are contradictory to Brown's prior deposition testimony such that they are a sham, even if they are troubling. Cardinal's Motion for Relief Under Rule 56(h) of the Federal Rules of Civil Procedure is required to be denied.

### B.    Motions for Partial Summary Judgment

#### 1.    *Summary judgment standard*

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Parties "asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).

The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999). Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate

by designating specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  Non-moving parties "need not present evidence in a form necessary for admission at trial; however, [they] may not merely rest on [their] pleadings."  Id.

The Court must view all evidence in the light most favorable to the party opposing the motion and must draw all inferences in favor of the non-movant, but only "to the extent supportable by the record."  Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) (quoting Scott v. Harris, 550 U.S. 372, 381 n.8 (2007)).  "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ."  Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246.  But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

2. *Cardinal's (Second) Motion for Partial Summary Judgment [143]*

In its second partial summary judgment motion, Cardinal seeks summary judgment: (1) on nVision's claim for fee amounts based on "transactions" for Cardinal's PD Courier unit at the LSA's "order level" rather than the "stop level"

or freight bill level; (2) on nVision's claim for fee amounts based on "flat file data feeds" and "multiple line item data fields" because they are not provided for in the LSA and Cardinal did not expressly or impliedly agree to pay them; (3) on Cardinal's claim for equitable reformation of the LSA's Pricing Schedule to reform the schedule to reflect the parties' "true intent" to fund self-invoice courier transactions at $.02 rather than $.20 or, alternatively, summary judgment that Cardinal's mutual mistake defense precludes nVision from recovering on its claims for fees calculated at the $.20 per funded self-invoice courier transaction rate; and, (4) on nVision's claim that Cardinal improperly used nVision's trade secrets.

      a.      <u>Summary judgment that the number of self-invoice courier transactions must be calculated at the stop level, not the order level</u>

The parties do not dispute that under the PD Courier system, individual orders from Cardinal's customers were grouped and assigned for shipment together for a specific delivery stop, thus minimizing the number of deliveries carriers charged to Cardinal. That is, if a customer had multiple orders to be delivered, those orders would be aggregated and picked up by a carrier for delivery to a Cardinal customer. nVision was responsible for this consolidation or order process for minimizing deliveries and thus reducing charges by carriers. After a shipper picked up and delivered these consolidated orders, the carriers generated freight

bills and invoices for the deliveries made by the carriers. nVision notified Cardinal how much was owed to its carriers for the deliveries made as reflected on the delivery freight bills and invoices carriers presented. In doing so, nVision requested Cardinal to deliver to nVision a payment equal to carrier freight bill and invoice amounts, which nVision deposited into the nVision Operating Account. These Cardinal funds were used by nVision to pay the carrier freight bills and invoices presented.

The central issue of contract interpretation before the Court is whether self-invoice transactions must be calculated at the "stop level," as Cardinal claims, or the "order level," as nVision claims.

"The construction of a contract is a question of law for the court." O.C.G.A. § 13-2-1; see also Brookside Cmtys., LLC v. Lake Dow North Corp., 603 S.E.2d 31, 32 (Ga. Ct. App. 2004) ("Contract disputes are particularly well suited for adjudication by summary judgment because construction of contracts is ordinarily a matter of law for the court."). "The hallmark of contract construction is to ascertain the intention of the parties. . . . [W]hen the terms of a written contract are clear and unambiguous, the court is to look to the contract alone to find the parties' intent." Infinity Gen. Ins. Co. v. Litton, 707 S.E.2d 885, 888 (Ga. Ct. App. 2011).

Section 1 of the LSA provides:

> **Services.**  Subject to the terms and conditions of this Agreement and according to the prices as set forth in **Appendix A**, **nVision** shall perform the services described in this Section 1 (collectively, the "Services") for [Cardinal].

(LSA § 1).

Section 1 contains five subsections, the first four of which (Sections 1.1-.4) state the services nVision was required to perform and the last of which (Section 1.5) describes the process for Cardinal to provide to nVision funds to pay carrier freight bills and invoices.  Sections 1.1 through 1.4 set out what services nVision must perform with respect to self-invoice courier transactions and for which nVision is entitled to compensation.  These sections of the LSA, especially Section 1.1, show that the services required are based on nVision's requirement to aggregate orders at a stop for single shipment by carriers and for which aggregated shipment a freight bill or invoice is produced that is advance funded by Cardinal for later payment by nVision with these Cardinal advanced funds.  The language of Section 1.1 shows that the entirety of the commercial relationship between nVision and Cardinal was based on transactions based on shipments consolidated at stops and was not based on per order processing.

Section 1.1 provides:

> nVision will perform a post-audit of all documents for expenses such as Freight Bills, Invoices, Excel Files or other Data Files, Request for Payment, Demand for Payment, etc. **associated with services provided or claimed to have been provided relating to transportation, warehousing, logistics, supply chain**, etc. for all sales orders, purchase orders, bills of laidings, transactions for inter-company and/or customer or vendor orders or transfers, etc. for all modes and for both international and domestic services.  Such **documents may include but are not limited to freight bills, invoices, Excel files or other data files**, request for payment, demand for payment, etc. containing information covering transportation, warehousing, logistics and / or supply chain expenses . . . .

(LSA § 1.1) (emphasis added).

The plain language of this subsection is that the services provided relate to transportation documentation review for transportation services provided by carriers and for which they billed.  These services were based on actual deliveries made by carriers based on pick-ups at stops, whether the stop consisted of the pick-up of a single or multiple orders.  The number of orders was relevant to the services provided only to the extent that nVision was to base its services "relating to transportation," and other logistics and supply chain activities.  That the services described by the LSA were per-stop transportation based is confirmed by the descriptions of the documents nVision was required to audit.  Section 1.1 describes these documents as "freight bills, invoices . . . request for payment, demand for

payment, etc. containing information covering transportation . . . ." (Id.). Any "freight bills" or "invoices" for transportation were for the transportation of Cardinal-provided products picked up at each stop and delivered to a Cardinal purchaser. There is nothing in Section 1.1 that supports that nVision's services were based on orders, rather than per stop pick-ups and deliveries. It was these per-stop transportation services for which nVision was entitled to compensation. Indeed, the whole purpose for having nVision was to consolidate orders into single shipments to reduce transportation costs and to otherwise gain shipping efficiencies.

Other section provisions support that the services for which nVision was entitled to compensation were based on nVision's enactment and review of per-stop transportation services. In Section 1.3, nVision was required to conduct pre-audit services of "all documents for expenses such as Freight Bills, Invoices, Excel Files . . . associated with services provided or claimed to have been provided relating to transportation" for Cardinal-provided products. (Id. § 1.3). Again, there is no suggestion that the parties anticipated that nVision would conduct its audit activities based on orders rather than the transportation of aggregated products, whether subject to one or many orders. In both Sections 1.1 and 1.3, orders are not mentioned as the level at which nVision would conduct its pre- or

post-audit work. That work was consistently defined as audits of transportation documents, specifically freight bills and invoices, irrespective of the number of orders they may have encompassed.

Section 1.5 of the LSA also supports this construction of the LSA. Section 1.5 addresses the FPA services for which nVision may bill Cardinal:

> nVision will submit a daily 'approve to pay' file to [Cardinal] identifying transactions due for payment based on carrier terms. nVision will invoice [Cardinal] monthly for **all applicable transactions** processed in its system. [Cardinal] will remit payment to nVision for services rendered in accordance with fee structure identified in Appendix A of this Agreement.

(Id. § 5.1) (emphasis added).

"[A]ll applicable transactions" are those that Sections 1.1 and 1.3 designated—services relating to per-stop transportation of goods. (Id. §§ 1.1, 1.3, 5.1). It is this definition of "transaction" that governs the "pricing and rates for nVision's services to [Cardinal] [as] identified in Appendix A." (Id. § 5.1).

The clear and unambiguous terms of the LSA allow nVision to charge to Cardinal for its services relating to review and payment processing transactions involving transportation services billed by carriers for the per-stop transportation services they performed and for which they were entitled to compensation. This conclusion is supported by the Pricing Schedule itself which: (1) defines reprocessing as involving the processing of carrier invoices and carrier

information, rather than customer orders or information; (2) contains three columns titled "Fee Per Transaction" that relate to fees nVision may charge Cardinal for processing and paying its carrier invoices at the "Non Funded," "Funded Payments Issued Via ACH 1 Day," and "Funded Payments Issued Via Check 4 Day" rates; and, (3) sets an annual baseline transaction volume that is incongruous with a transaction volume based on the processing of customer orders—rather than per-stop transportation charges.

On page 4 of the Pricing Schedule,[25] "reprocessing" is defined as "any paper invoice that is resubmitted by the carrier and nVision has to open, prep, image or physically handle the paper in any way." "Reprocessing" is also defined in the Pricing Schedule as "taking in another [carrier] EDI transmission with the EDI record."[26] On page 5 of the Pricing Schedule, reprocessing is referred to as taking in pages from "Flat File transmission[s]" associated with carrier invoice packets, to include freight invoices and associated bills of lading. The manner in which the Pricing Schedule defines reprocessing unambiguously provides that the Pricing Schedule does not contemplate and does not permit nVision to charge for the

---

[25] The first three pages of the Pricing Schedule do not discuss fees and transactions that may be charged to Cardinal by nVision under the terms of the LSA.

[26] EDI transmissions and records relate to electronic data used by carriers and are unrelated to Cardinal's customer orders.

processing or reprocessing of the individual order information as opposed to aggregated and consolidated deliveries from shipment stops.

The Pricing Schedule even is organized in a manner to indicate that chargeable transaction fees are for the processing of carrier invoices at the stop level. Chargeable "Fee[s] Per Transaction" are listed on pages 4 and 5 of the Pricing Schedule under column headings that specify the fees nVision may charge Cardinal for the processing and paying of its carrier invoices at the "Non Funded," "Funded Payments Issued Via ACH 1 Day," and "Funded Payments Issued Via Check 4 Day" rates. That the Pricing Schedule references "Fee[s] Per Transaction" and ties those amounts to whether Cardinal provided advanced funds for payments to carriers, and whether a payment to a carrier would be made electronically or by check, shows that nVision was only permitted to charge for stop-level transactions for carrier transportation services that nVision processed.

Finally, page 5 of the Pricing Schedule states that the annual baseline transaction volume for self-invoice courier transactions—which are transactions that produced a carrier freight bill—was agreed to be 6,816,000. (DSMF I at 17-18, 45-46). Based on nVision's claim that it was entitled to charge a fee for every customer order it processed, nVision asserts that it processed more than 35 million transactions per year—a figure more than five times greater than that which was

estimated by the parties when they signed the LSA. (PSMF I at 45). It defies logic for nVision to suggest that it was entitled, pursuant to the LSA, to charge Cardinal for every order it processed when the LSA's projected annual baseline for self-courier transactions clearly supports the conclusion that chargeable transactions occur only when an invoice or freight bill is generated and sent to Cardinal's carriers for a shipment of Cardinal's products based on customer orders.

The terms of the Pricing Schedule and LSA unambiguously provide that nVision may bill only for the services nVision provided under Sections 1.1 through 1.4 in reviewing the transportation services charged by carriers for the transportation of products picked up at a stop and delivered to a Cardinal customer and under Section 1.5 for processing payments to carriers. That is, "transaction" for the purposes of the LSA is the review and processing by nVision of freight bills and invoices for deliveries from a stop to a destination. The LSA does not allow nVision to charge Cardinal for the purported processing of individual orders.[27] Summary judgment is granted to Cardinal on this claim.

_____

[27] Even if the Court determined that the term "transaction" was ambiguous—which it does not—the undisputed evidence is that the RFP clearly called for stop-level consolidation and allowing nVision to bill for the carrier transactions for which nVision was responsible. See Baker v. Jellibeans, Inc., 314 S.E.2d 874, 876 (Ga. 1984) (citing O.C.G.A. §§ 13-2-2(1), 24-6-3; Kellos v. Parker-Sharpe, Inc., 263 S.E.2d 138, 140 (Ga. 1980); Wood v. Phoenix Ins., Co., 34 S.E.2d 688, 692 (Ga. 1945)) (affirming grant of summary judgment where trial court relied upon

### b. Summary judgment that nVision is not permitted to charge Cardinal for "flat file data feed" and "multiple line item data field" charges

Charges for "flat file data feed" and "multiple line item data field" fees are not included in the Pricing Schedule to the LSA. nVision admits that "'Flat File Data Feeds' and 'multiple line item data fields' were not services defined in the LSA." (DSMF I at 28). nVision appears instead to claim that it is entitled to recover fees for these services on a "breach of additional contracts" theory, and on equitable theories of unjust enrichment, quantum meruit, and promissory estoppel.

A claim of unjust enrichment only arises where a contract does not exist between the parties and one party has received a benefit from another party and ought to return the benefit received or pay compensation for the benefit obtained. Engram v. Engram, 463 S.E.2d 12, 15 (Ga. 1995) ("Unjust enrichment applies when as a matter of fact there is no legal contract, but when the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefitted party equitably ought to return or compensate for.") (citations and punctuation omitted); see also Tuvim v. United Jewish Cmtys., Inc., 680 S.E.2d 827, 829-30 (Ga. 2009). "[A] claim for unjust enrichment is not a tort, but an alternative theory of recovery if a contract claim fails. The theory of unjust

contemporaneous writings, despite merger clause, to construe contract and determine intent of the parties).

enrichment applies when there is no legal contract and when there has been a benefit conferred which would result in an unjust enrichment unless compensated." Tidikis v. Network for Med. Commc'ns & Research, LLC, 619 S.E.2d 481, 485 (Ga. Ct. App. 2005).

"It [also] has long been the law in Georgia that although a party may plead in alternative counts, no recovery may be had in quantum meruit when a contract governs all claimed rights and responsibilities of the parties." Choate Constr. Co. v. Ideal Elec. Contractors, Inc., 541 S.E.2d 435, 438-39 (Ga. Ct. App. 2000); see also Ga. Real Estate Props., Inc. v. Lindwall, 692 S.E.2d 690, 693 (Ga. Ct. App. 2010) ("There cannot be an express and implied contract for the same thing existing at the same time between the same parties. A plaintiff is estopped to recover on quantum meruit where there exists an express agreement.") (internal quotation and citation omitted).

Promissory estoppel "requires a showing that (1) the defendant made certain promises, (2) the defendant should have expected that the plaintiffs would rely on such promises, and (3) the plaintiffs did in fact rely on such promises to their detriment." Adkins v. Cagle Foods JV, LLC, 411 F.3d 1320, 1326 (11th Cir. 2005). A party may not reasonably rely upon promises to pay amounts for additional services where there is a contractual relationship between the parties and

the contract specifically provides that it may only be added to or altered by a writing signed by each party.  See <u>Bank of Dade v. Reeves</u>, 354 S.E.2d 131, 133 (Ga. 1987) (promissory estoppel not present where a contract governs the relationship between the parties); <u>Gerdes v. Russell Rowe Commc'ns, Inc.</u>, 502 S.E.2d 352, 354-55 (Ga. Ct. App. 1998) (quoting <u>Hendricks v. Enter. Fin. Corp.</u>, 405 S.E.2d 566, 569 (Ga. Ct. App. 1991)) (where a contract governs the relationship between parties and specifically provides that the contract may only be altered in writing, a party may not "reasonably rely upon any words or other course of dealing to his inducement, other than a modification agreement actually reduced to writing"); <u>see also</u> <u>Adkins</u>, 411 F.3d at 1326 ("[W]here a plaintiff seeks to enforce an underlying contract which is reduced to writing, promissory estoppel is not available as a remedy."); <u>Bouboulis v. Scottsdale Ins. Co.</u>, Civil Action No. 1:10-cv-2972-JEC, 2012 WL 917844, at *10-*11 (N.D. Ga. Mar. 16, 2012) ("Georgia law bars a claim for promissory estoppel in the face of an enforceable contract.").  If a contract between parties requires that additional services or amendments must be in writing, a party may not claim reasonable reliance on promises to pay for additional services and invoke the remedy of promissory estoppel.  <u>See</u> <u>id.</u>

Under the LSA, Cardinal retained nVision "to provide logistics related services to [Cardinal]," to include services associated with the pre-auditing and processing of documents for payment of carriers. (LSA at 1, §§ 1.3-1.5). Section 5.1 referenced Appendix A, the Pricing Schedule, as the exclusive document that listed "all pricing and rates for nVision's services" that were permitted to be charged under the LSA. Section 11.7 of the LSA contains a merger clause that states:

> This Agreement and attached Schedule(s): (i) represent the entire understanding between the parties hereto with respect to the subject matter set forth herein, (ii) supersede all negotiations, agreements, contracts, commitments and understandings, both oral and written between and [sic] Client and nVision (iii) do not operate as an acceptance of, and shall prevail over, any conflicting provisions of any purchase order or any other instrument provided to nVision by Client. No modifications, additions, or amendments to this Agreement shall be effective unless made in writing and executed by a duly authorized representative of each party.

The Court finds that the LSA constitutes the entire agreement between the parties for providing FPA services, to include pre-auditing and document processing services that involved entering data into multiple fields and processing flat file data feeds. The Pricing Schedule to the LSA sets out all of the services for which nVision would be paid under the agreement and the merger clause precludes

charging fees for additional FPA services absent a change "made in writing and executed by a duly authorized representative of each party." (Id. § 11.7).

nVision has not stated a claim for "flat file data feed" and "multiple line item data field" fees, or any other fees not provided for under the LSA for FPA services, under a theory of "breach of additional contracts," unjust enrichment, quantum meruit, or promissory estoppel, and summary judgment on the claim is granted.

           c.    <u>Summary judgment that Cardinal is entitled to equitable reformation of the agreement to reflect the parties' intended rate of $.02 per self-invoice courier transaction</u>

"A petition for reformation of a written contract will lie where by mistake of the scrivener and by oversight of the parties, the writing does not embody or fully express the real contract of the parties." <u>Curry v. Curry</u>, 473 S.E.2d 760, 761 (Ga. 1996) (quoting <u>McLoon v. McLoon</u>, 136 S.E.2d 740, 741 (Ga. 1964)) (internal quotation omitted). "The cause of the defect is immaterial so long as the mistake is common to both parties to the transaction." <u>Id.</u> (citing <u>Gauker v. Eubanks</u>, 199 S.E.2d 771, 774 (Ga. 1973)).

"Where reformation is sought on the ground of mutual mistake, it must . . . be proved to be the mistake of both parties." O.C.G.A. §§ 23-2-21, 23-2-31; <u>Lee v. Am. Cent. Ins. Co.</u>, 530 S.E.2d 727, 730 (Ga. Ct. App. 1999). Where a mistake

is not mutual, a party may obtain equitable reformation by showing its own unilateral mistake and fraud on the part of the other party to the contract. See O.C.G.A. §§ 23-2-21, 23-2-29; Exec. Excellence, LLC v. Martin Bros. Invs., LLC, 710 S.E.2d 169, 177 (Ga. Ct. App. 2011); Kent v. State Farm Mut. Auto. Ins. Co., 504 S.E.2d 710, 714 (Ga. Ct. App. 1998).[28] Whether there is a mutual mistake or prejudice to the other party is an issue of fact. See Long v. Walls, 177 S.E.2d 373, 375-76 (Ga. 1970).

To obtain equitable relief based on a mutual mistake it must be proven to be the mistake of both parties and the evidence of a mutual mistake must be "clear, unequivocal and decisive." O.C.G.A. § 23-2-21; see Ivey v. Ivey, 465 S.E.2d 434, 436 (Ga. 1996); see also Fox v. Washburn, 449 S.E.2d 513, 514 (Ga. 1994) ("Although the evidence as to the mistake must be clear, unequivocal and decisive, there is no rule that reformation will be denied unless the mistake be admitted by both parties."). Where there are disputed issues of fact regarding the intentions of the parties, the issues are put to a jury for determination. See Fox, 449 S.E.2d at 514 ("[Plaintiff's] allegation, together with the actual conduct of both parties over

---

[28] The Court notes that Cardinal seeks equitable reformation on the grounds that there was a mutual mistake and scrivener's error in making the LSA. (Def.'s Am. Countercl. ¶¶ 61-66). Cardinal has not alleged a unilateral mistake on its part and fraud on the part of nVision as grounds for its claim of equitable reformation. (Id.).

a period of eight years [after execution of a contract], presents questions as to the intent of the parties in entering into the agreement and [plaintiff's] credibility" that "can only be resolved by submitting the case to a jury.").

Both parties have offered evidence regarding whether they had agreed that the price for funded self-courier invoicing was supposed to be $.02 or $.20. Cardinal claims that throughout the negotiations regarding the LSA both parties intended the fee for funded self-courier transactions to be $.02, that there was a scrivener's error, and that the pricing logic and post-execution performance supports its position. nVision, primarily through the uncorroborated testimony of its CEO, Brown, claims that the LSA reflects the intentions of the parties and that nVision always intended the price to be $.20.

In the abundant discovery in this litigation, there is nothing in the record cited by the parties that permits the Court to find that there is clear, unequivocal, and decisive evidence of a mutual mistake in the formation of the LSA. Although nVision's evolving position on this pricing issue, and its reliance on the troubling late-filed affidavit by Brown, undercuts the merit of its position, the contentions raised by each side and supported by the record demonstrate that a disputed

genuine issue of material fact exits and summary judgment on Cardinal's equitable reformation claim is denied.[29]

        d.    <u>Summary judgment that Cardinal has not retained or used any of nVision's trade secrets or proprietary information</u>

nVision has not presented any facts to support its contention that, after January 26, 2011, Cardinal used nVision's software programs or trade secrets, and that the computer systems used by Cardinal were derived from nVision's efforts and proprietary information. (PSMF I at 71-79; PSAMF I at 33-37; DSMF I at 61-70). nVision also has not identified with any degree of particularity what asserted

---

[29] nVision also argues that there can be no equitable reformation because of the existence of a merger clause in the LSA and Cardinal's negligence in failing to timely notice the alleged error. In Georgia, a merger clause, delay, and negligence ordinarily do not preclude a party from seeking equitable reformation of a contract. <u>See</u> O.C.G.A. §§ 23-2-24, 23-2-32; <u>Goodson v. Ford</u>, 725 S.E.2d 229, 234 (Ga. 2012) (delay is not grounds for denying equitable relief unless a party also shows prejudice); <u>Zaimis</u>, 570 S.E.2d at 314 (quoting <u>Rasmussen</u>, 223 S.E.2d at 665) ("The doctrine of merger is applicable where there is no evidence of mutual mistake . . . but it should not be used to bar consideration of probative evidence offered to show an alleged mutual mistake in [a] reformation case."); <u>Curry</u>, 473 S.E.2d at 761 (citing <u>Sheldon v. Hargrose</u>, 100 S.E.2d 898, 900 (Ga. 1957); <u>McCollum v. Loveless</u>, 200 S.E. 115, 116 (Ga. 1938) ("[T]he negligence of the complaining party will not defeat his right to reformation if the other party has not been prejudiced."). Cardinal first noted its asserted discrepancy in the Pricing Schedule in March 2008, two weeks after the LSA was executed. Although it is doubtful that nVision could have suffered any prejudice based on Cardinal's two-week delay in bringing to nVision's attention its belief that the pricing for funded self-courier transactions was incorrect, particularly in light of the fact that it has retained more than $18.5 million following the termination of the LSA, nVision claims prejudice was suffered and the Court concludes the viability of this claim should be considered by the jury as part of Cardinal's equitable reformation claim.

trade secrets or proprietary information Cardinal had access to, much less relied upon or used, in its FPA processes after nVision suspended services. (PSMF I at 71-79; PSAMF I at 33-35; DSMF I at 61-72). nVision's Director of Technology is also unable to identify any misappropriation by Cardinal of nVision's trade secrets or proprietary information after the termination of services. (DSMF I at 66-67).

nVision's argument is essentially that their company processes are trade secrets, but it has failed to specify what processes it claims are protected, how they are trade secrets, and how any such trade secret has been improperly retained or used by Cardinal. The Court finds nVision has failed to establish any genuine dispute of material fact to survive Cardinal's motion for summary judgment on this claim and its unspecified company processes are not protected trade secrets. See Aukerman v. Witmer, 568 S.E.2d 123, 128-29 (Ga. Ct. App. 2002). No rational trier of fact could find for nVision on its trade secrets claim and summary judgment for Cardinal is granted.

### 3.  nVision's (Second) Motion for Partial Summary Judgment [148]

In its second partial summary judgment motion, nVision moves and cross moves for summary judgment: (1) on Cardinal's claim for equitable reformation; (2) on Cardinal's claims for equitable relief on the grounds that Cardinal refused to pay claimed undisputed fees, engaged in settlement and contract negotiations in

bad faith, bullied nVision in negotiations, and did not timely pay fees owed to nVision; and, (3) on nVision's claim that Cardinal did not, and does not, have a legal or equitable right to funds in nVision's possession when nVision suspended its performance under the LSA.

    a.    <u>Summary judgment that Cardinal is not entitled to the remedy of equitable reformation because there is no plausible evidence of a mutual mistake and Cardinal was negligent in noticing and notifying nVision of any alleged mistake</u>

The Court has determined that negligence and delay do not prohibit equitable reformation absent a showing of prejudice. <u>See</u> O.C.G.A. §§ 23-2-24, 23-2-32; <u>Goodson</u>, 725 S.E.2d at 234; <u>Curry</u>, 473 S.E.2d at 761; <u>Long</u>, 177 S.E.2d at 375-76. The Court also has found that the evidence demonstrates a genuine dispute of fact regarding whether the parties intended to establish the funded self-invoice courier fee in the LSA as $.20 or $.02. Summary judgment for nVision is denied on this claim.

    b.    <u>Summary judgment that Cardinal is not entitled to the relief on its equitable claims based on the doctrine of unclean hands</u>

In Georgia,

> "[u]nclean hands" is a shorthand reference to OCGA § 23-1-10, which states, "He who would have equity must do equity and must give effect to all equitable rights of the other party respecting the subject matter of the action." <u>See</u> <u>Dobbs v. Dobbs</u>,

> 270 Ga. 887, 888, 515 S.E.2d 384 (1999) (noting that OCGA
> § 23-1-10 "embodies both the 'unclean hands' doctrine and the
> concept that 'one will not be permitted to take advantage of his
> own wrong.'" (citations omitted)).  However, relief is precluded
> only if the inequity so infects the cause of action that to entertain
> it "'would be violative of conscience.'"  <u>Pryor v. Pryor</u>, 263 Ga.
> 153, 153, 429 S.E.2d 676 (1993).

<u>Goodson</u>, 725 S.E.2d at 233.  A failure to discharge indebtedness to a party,

particularly where the relationship between the parties has deteriorated and one

party refuses to state or misrepresents the true amounts owed, does not preclude

the allegedly indebted party from seeking equitable relief based on the "unclean

hands" doctrine.  See <u>Dobbs</u>, 515 S.E.2d at 385; <u>see also</u> <u>Miles v. Deen</u>, 361

S.E.2d 60, 61 (Ga. Ct. App. 1987) ("[I]t is extremely doubtful that the decedent's

mere failure to pay a lawful debt owed to the appellee could, in and of itself, be

considered the type of illegal, immoral, fraudulent, or unconscionable conduct

contemplated by the clean-hands doctrine.").

nVision claims that Cardinal should be precluded from asserting any

equitable claims because Cardinal: (1) failed to pay bills that nVision issued, which

included charges Cardinal disputed; (2) entered into settlement and contract

negotiations in bad faith; (3) "engaged in bullying tactics in an attempt to force an

unfair contract with nVision;" (4) failed to pay nVision's claimed contract fees for

a period of eighteen (18) months; (5) decided to negotiate with other FPA service

providers as its relationship with nVision deteriorated; and, (6) decided not to engage in additional business with nVision after its billing dispute arose and negotiations to resolve the dispute were unsuccessful.  (Pl.'s Reply Br. in Supp. of its Mot. for Partial Summ. J. [191] at 11-12; Pl.'s Mot. for Partial Summ. J. [148] at 15-23).

The Court finds that Cardinal's actions in response to the disputed bills and the litany of actions to which nVision objects, which essentially are related to Cardinal's failure to pay fees to nVision and to negotiate a resolution to their business dispute, are not conduct that so violates the conscience that bars the equitable causes of action that Cardinal alleges.  The undisputed facts support that Cardinal's reaction to what it asserted was overbilling by nVision, and nVision's refusal to correct claimed errors in its bills, was reasonable conduct by Cardinal under the circumstances, particularly where nVision eventually terminated the Agreement and retained more than $18.5 million in funds that Cardinal had advanced for nVision to use to pay to Cardinal's carriers.[30]  The Court also finds that Cardinal's conduct in attempting to negotiate a resolution to the billing dispute

---

[30] To the extent nVision argues that there were undisputed amounts owed to it from Cardinal, the Court finds that the record is clear that the bills from nVision to Cardinal for services provided under the LSA were disputed, there was little the parties agreed on regarding amounts owed to nVision, and Cardinal's refusal to pay these disputed amounts does not constitute bad faith.  See Dobbs, 515 S.E.2d at 385.  At bottom, this is a contract dispute.

was not in bad faith and Cardinal did not engage in "bullying tactics," particularly in light of nVision's behind the scenes strategy to cause Cardinal to advance funds into the nVision Operating Account and accrue excess funds in anticipation of nVision's termination of its services. See O.C.G.A. § 23-1-12 ("The equity of a party who has been misled is superior to that of the person who willfully misleads such party."); Jordan Co. v. Bethlehem Steel Corp., 309 F. Supp. 148, 152 (S.D. Ga. 1970). No rational trier of fact could find that Cardinal has unclean hands in this action and summary judgment for nVision is denied on this claim.

> c. Summary judgment that Cardinal has no legal or equitable right to any funds in nVision's possession while the LSA is suspended

In its January 10th Order, the Court found that: (1) nVision did not suspend its performance under the LSA; (2) nVision breached the LSA; (3) the LSA terminated on March 14, 2012; (4) Cardinal is entitled to actual damages for nVision's breach of contract in failing to pay carriers as required by Section 1.5 of the LSA in an amount to be determined at trial; (5) Cardinal is entitled to actual damages for nVision's breach of contract in failing to provide Cardinal with access to data in its systems for a period of ninety (90) days after termination of the LSA in an amount to be determined at trial; and, (6) there are disputed issues of fact regarding Cardinal's equitable claim for a constructive trust regarding the funds in

the nVision Operating Account. (Order of Jan. 10, 2012, at 40-44, 48-50). The Court determines that nVision's claim that Cardinal has no equitable right to funds in the nVision Operating Account or that the LSA was validly suspended pursuant to Section 5.1 of the LSA is moot.

### 4. nVision's Renewed Motion for Summary Judgment on Cardinal's Counterclaims of Fraud and Estoppel [206]

In its Renewed Motion for Summary Judgment on Cardinal's Counterclaims of Fraud and Estoppel, nVision moves for summary judgment (1) on Cardinal's counterclaim for fraud; and, (2) on Cardinal's counterclaim for equitable estoppel.

#### a. Summary judgment on Cardinal's fraud counterclaim

Federal courts sitting in diversity apply the substantive law of the forum state, including the forum state's choice of law principles. Boardman Petroleum, Inc. v. Federated Mut. Ins. Co., 135 F.3d 750, 752 (11th Cir. 1998) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941) (no pincite cited)). "The first step in determining whose law is to govern in a conflict situation is the characterization of what kind of case is involved. The law of the forum controls this." O'Neal v. Kennamer, 958 F.2d 1044, 1046 (11th Cir. 1992).

In determining what law applies to a tort claim, "Georgia continues to apply the traditional choice of law principles of *lex loci delicti*." Mgmt. Sci. Am., Inc. v. NCR Corp., 765 F. Supp. 738, 739 (N.D. Ga. 1991) (citing Karimi v. Crowley, 324

S.E.2d 583 (Ga. Ct. App. 1984) (no pincite cited)). Under these principles, the

"law of the place where the injury occurred . . . determines the substantive rights of

the parties." Id. (citing Risdon Enters. Inc. v. Colemill Enters, Inc., 324 S.E.2d

738 (Ga. Ct. App. 1984) (no pincite cited)). Where the injury occurred is "the

place where . . . there takes place the last event necessary to make an actor liable

for an alleged tort." Id. "[T]he last event necessary to make an actor liable for

fraud is the injury, and consequently, for purposes of *lex loci delictis*, the place of

the wrong is where that injury is sustained." IBM v. Kemp, 536 S.E.2d 303, 306

(Ga. Ct. App. 2000). Because the representations by nVision that Cardinal asserts

are the basis for its fraud claim ultimately caused an economic injury to Cardinal in

Ohio, where it is headquartered, Ohio substantive law regarding fraud applies.

(Def.'s Memo. in Opp'n to Pl.'s Renewed Mot. for Summ. J. [214] at 13 n.7;

Def.'s Am. Countercl. ¶ 1).

> In Ohio, the elements of a fraudulent misrepresentation claim are:
> (1) a representation, or where there is a duty to disclose,
> concealment of a fact; (2) which is material to the transaction at
> hand; (3) made falsely, with knowledge of its falsity, or with such
> other disregard and recklessness as to whether it is true or false
> that knowledge may be inferred; (4) with the intent of misleading
> another into relying on it; (5) justifiable reliance upon the
> representation or concealment; and (6) a resulting injury
> proximately caused by the reliance.

<u>Lemmon v. Ayres</u>, --- F. Supp. 2d ----, 2012 WL 910199, at *13 (S.D. Ohio Mar. 16, 2012).

For a fraud claim to survive summary judgment, there must be some evidence on each element from which a rational jury could find for the party seeking relief.  <u>See</u> <u>Wolfe v. Chrysler Corp.</u>, 734 F.2d 701, 703-04 (11th Cir. 1984).  Fraud is a claim that ordinarily requires submission to a jury.  <u>See</u> <u>id.</u>

Cardinal alleges that nVision committed fraud when nVision submitted payment due requests to Cardinal for the payment by nVision of carrier shipment fees when nVision did not intend to use Cardinal's funds to pay Cardinal's carriers.

A rational trier of fact could find that nVision made intentionally false representations that were material to its transactions with Cardinal when, on January 24, and 25, 2011, nVision requested Cardinal to forward funds for nVision to pay Cardinal's carriers knowing that nVision did not intend to pay the carriers with the funds forwarded.  A trier of fact further could find based on the record evidence that Cardinal justifiably relied on these intentionally false representations to its detriment and injury when it forwarded the funds requested in the payment due requests nVision sent.[31]  Based on the record, particularly the emails between

---

[31] The Court notes that, contrary to nVision's assertions in its reply brief, the record reflects that Cardinal made payments in response to the January 24th and 25th funding requests at issue in its fraud claim.  (Pl.'s Reply Memo. in Supp. of

Sanders and Brown, there is an adequate factual basis for a rational trier of fact to find: (1) that there were sufficient funds in the nVision Operating Account to pay Cardinal's carriers at the time nVision made its funding requests; (2) that nVision falsely represented to Cardinal that additional funds were required to pay carriers when it had no intention of making those payments;[32] (3) that nVision's false representations were material to its transactions with Cardinal under the LSA; (4) that nVision knew when it made its funding requests that those statements were false; (5) that nVision intended to induce and mislead Cardinal to act in reliance on those funding requests and advance funds so that nVision could accrue excess funds in the nVision Operating Account in anticipation of the termination of services; (6) that Cardinal, unaware of nVision's plan to accrue excess funds in the nVision Operating Account, justifiably relied upon nVision's intentionally false misrepresentations and acted by sending funds to nVision in response to those misrepresentations; and, (7) that Cardinal suffered an injury and damages that were

---

its Renewed Motion for Summ. J. on Def.'s Countercls. of Fraud and Estoppel [223] at 2-4; DSAMF II at 41-42; PSMF II at 73-75; PSOF ¶¶ 159-161, 167; DASOF at 3-6; Aff. of Charlotte A. Sanders ¶¶ 21-22).

[32] The Court notes that while fraud generally cannot be based upon a representation concerning future events, "a promise made with a present intention not to perform, called promissory fraud, is a misrepresentation of existing fact even if the promised performance is to occur in the future" and can serve as the basis for a fraud claim under Ohio law. See Lemmon, --- F. Supp. 2d at ----, 2012 WL 910199, at *13 (citing Micrel, Inc. v. TRW, Inc., 486 F.3d 866, 874 (6th Cir. 2007)).

proximately caused by its reliance on nVision's representations when nVision

suspended services and refused to return the improperly obtained funds.[33]  There is

sufficient evidence, even if barely, to support each element of Cardinal's fraud

claim, and nVision's request for summary judgment on Cardinal's fraud claim is

denied.[34]

       b.     <u>Summary judgment on Cardinal's equitable estoppel counterclaim</u>

"In order for equitable estoppel to arise, there must generally be some

intended deception in the conduct or declarations of the party to be estopped . . . by

which another has been misled to his injury."  O.C.G.A. § 24-4-27; <u>see also</u> <u>Ward</u>

<u>v. Morgan</u>, 629 S.E.2d 230, 233 (Ga. 2006) (citing <u>Bennett v. Davis</u>, 39 S.E.2d 3

(Ga. 1946) (no pincite cited)) ("[E]stoppel requires an act on the part of one

---

[33] nVision objects to Cardinal's reliance on the emails discovered in this litigation that indicate a plan on the part of nVision to accrue and maintain a balance in the nVision Operating Account in excess of what was required to pay Cardinal's carriers.  The Court finds these documents are relevant and may be considered to evaluate Cardinal's fraud claim because they relate directly to nVision's knowledge and intent regarding its funding requests in the months leading up to the cessation of services.

[34] If Georgia law applied, the analysis would be the same because Cardinal has presented sufficient evidence on each element of fraud under Georgia law to preclude granting summary judgment for nVision.  <u>See</u> <u>Baxter v. Fairfield Fin.</u> <u>Servs.</u>, 704 S.E.2d 423, 429 (Ga. Ct. App. 2010) (citation omitted) (plaintiffs alleging fraud must establish: "a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff.").

intended to influence the other, and detrimental reliance upon that act by the other."); <u>AAF-McQuay, Inc. v. Willis</u>, 707 S.E.2d 508, 521 (Ga. Ct. App. 2011) ("A party may be equitably estopped from raising a particular claim or defense 'where there is some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence as to amount to constructive fraud, by which another has been misled to his injury.'"). "[E]stoppel is not a cause of action. Absent a proper legal claim, a plaintiff cannot recover simply by establishing the elements of equitable estoppel." <u>Marshall v. King & Morgenstern</u>, 613 S.E.2d 7, 11 (Ga. Ct. App. 2005) (citing <u>Kirkland v. Pioneer Mach., Inc.</u>, 534 S.E.2d 435, 437 (Ga. Ct. App. 2000)); <u>see also</u> <u>AAF-McQuay, Inc.</u>, 707 S.E.2d at 521 (equitable estoppel is an affirmative defense).

To invoke the remedy of equitable estoppel, a party must establish:

> (1) conduct amounting to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; [and] (3) knowledge, actual or constructive, of the real facts; and, as to the party claiming the estoppel: (1) lack of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially.

<u>Medders v. Smith</u>, 537 S.E.2d 153, 155 (Ga. Ct. App. 2000). "Estoppels are not favored by the law and for an equitable estoppel to arise some intended deception in the conduct or declarations of the party to be estopped must be shown." <u>Cobb Bank & Trust Co. v. Am. Mfrs. Mut. Ins. Co.</u>, 459 F. Supp. 328, 334 (N.D. Ga. 1978). "The existence of estoppel is generally a question for the factfinder to resolve." <u>AAF-McQuay, Inc.</u>, 707 S.E.2d at 521 (quoting <u>Carragher v. Potts</u>, 686 S.E.2d 348, 351-52 (Ga. Ct. App. 2009)).

Cardinal asserts in its Amended Counterclaim for equitable estoppel that "nVision should be estopped from claiming that it is entitled to any of the funds Cardinal Health advanced to it to pay carriers." (Am. Countercl. ¶ 90). nVision seeks summary judgment on this counterclaim on the grounds that equitable estoppel is not a cause of action, but rather an affirmative defense. (Pl.'s Memo. in Supp. of its Renewed Mot. for Summ. J. [206.1] at 25). Recognizing that Georgia law treats equitable estoppel as an affirmative defense and not a cause of action, Cardinal requests that the Court treat its equitable estoppel counterclaim as affirmative defense pursuant to Federal Rule of Civil Procedure 8(c)(2). (Def.'s Memo. in Opp'n to Pl.'s Renewed Mot. for Summ. J. at 24 n.21).

nVision has been on fair notice that Cardinal intends to assert a claim of equitable estoppel, but Cardinal's claim only may be asserted as an affirmative

defense to nVision's claims "to any of the funds Cardinal Health advanced to it to pay carriers." <u>See</u> Fed. R. Civ. P. 8(c)(2); <u>Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.</u>, 583 F.3d 832, 840 (Fed. Cir. 2009) (abuse of discretion to strike a mistakenly designated affirmative defense because responsive pleadings should be liberally construed to maximize a defendant's available legal theories); <u>Smith v. Wal-Mart Stores, Inc.</u>, No. 1:11-cv-226-MP-GRJ, 2012 WL 2377840, at *2-*5 (N.D. Fla. June 25, 2012) (defendant only required to give fair notice of an affirmative defense to be able to utilize at trial); (Am. Countercl. ¶ 90).[35]

The Court finds that Cardinal has presented sufficient information to support that a rational finder of fact could find nVision intentionally made a false representation to Cardinal with knowledge of the real facts and that Cardinal, with lack of knowledge as to the truth, detrimentally relied upon nVision's false representations and suffered prejudice and an injury. The Court finds that Cardinal is entitled to invoke the affirmative defense that nVision should be equitably

---

[35] The Court finds there is no prejudice to any party in converting this counterclaim to an affirmative defense pursuant to Federal Rule of Civil Procedure 8(c)(2) because both parties have been aware of Cardinal's invoking of equitable estoppel since the filing of its Amended Answer and Counterclaims. The Court further finds nVision has demonstrated no prejudice or any other grounds upon which to find that Cardinal's equitable estoppel counterclaim should not be treated as an affirmative defense.

estopped from recovery on its claims to the funds Cardinal advanced to pay its carriers. nVision's request for summary judgment to preclude Cardinal from relying upon the affirmative defense of equitable estoppel is denied.

C.    Remaining claims and issues for trial

After five motions for summary judgment and numerous procedural motions, the following is the disposition of the parties' claims and counterclaims.

nVision's claims in its Amended Complaint:

Count I – Breach of the Logistics Services Agreement: This claim will proceed to trial. nVision's recovery is limited to its actual damages "for all amounts invoiced and owed under the LSA, and for the amounts that nVision would have billed to Defendant if Defendant had provided nVision with all of the documents, as agreed." (Am. Compl. ¶ 121). nVision's recovery is further limited by the Orders of this Court that found that: (1) nVision may not recover for any expenses that were billed to Cardinal more than 180 days after the expense was incurred; (2) any bills for funded self-invoice courier transactions must be calculated based on the stop level pursuant to the terms of the LSA; and, (3) nVision may only recover for services specified in the LSA and may not recover for items not listed on the LSA, such as software development fees, "flat file data feed" fees, or "multiple data field" fees.

Counts II, III, IV, and V – Breach of Additional Contracts, Promissory Estoppel, Unjust Enrichment, and Quantum Meruit:  Summary judgment is granted to Cardinal on its claim regarding amounts nVision claims it is owed for fees for services that were not specifically covered in the LSA because the LSA constituted the entire agreement between the parties for nVision's provision of FPA services to Cardinal and any additional agreements for FPA services were required to be "made in writing and executed by a duly authorized representative of each party."

Count VI – Improper Use of nVision's Confidential Information and Trade Secrets:  Summary judgment is granted to Cardinal on this claim.

Count VII – Attorneys' Fees and Expenses of Litigation:  Section 9 of the LSA does not preclude nVision from seeking attorneys' fees as actual damages pursuant to O.C.G.A. § 13-6-11.

Cardinal's counterclaims in its Answer to Plaintiff's Amended Complaint and Amended Counterclaims:

Count I – Declaratory Judgment:  Summary judgment was granted to Cardinal, in part, regarding the determination that the LSA was terminated and nVision is liable for actual damages it incurred after being denied access to its data for ninety (90) days following termination.  To the extent Cardinal seeks a declaratory judgment regarding the disposition of funds held by nVision, those

claims are subsumed by its other counterclaims and the remaining issues in its request for a declaratory judgment are moot.

Count II – Constructive Trust and, Alternatively, Bailment:  nVision's Motion for Judgment on the Pleadings and Motion for Partial Summary Judgment regarding this claim were denied.  The constructive trust claim will proceed to trial. Cardinal's alternative bailment claim will not proceed to trial.

Count III – Equitable Reformation:  nVision's Motion for Judgment on the Pleadings, Motion for Partial Summary Judgment, and Second Motion for Partial Summary Judgment regarding this claim were denied.  This claim will proceed to trial.

Count IV – Breach of Contract:  Summary judgment was granted to Cardinal for nVision's breach of the LSA based on nVision's failure to pay advanced funds to carriers and nVision's failure to provide Cardinal access to its data using nVision's systems and software for a period of ninety (90) days after termination of the LSA.  Damages for these breaches will be determined at trial.  Cardinal's remaining breach of contract claims will proceed to trial, to include breach of contract claims based on nVision's overcharging; failing to provide services as required under the LSA; charging of services for which it did not perform, which were not authorized, or which were performed for nVision's sole benefit; retention

and diversion of funds Cardinal forwarded for the express purpose of paying Cardinal's carriers; and, breach of the confidentiality provision of the LSA by attaching the LSA to its original Complaint without seeking to file it under seal or otherwise protecting its confidentiality.

Count V – Fraud:  nVision's Motion for Judgment on the Pleadings, Motion for Partial Summary Judgment, and Second Motion for Partial Summary Judgment regarding this claim were denied.  This claim will proceed to trial and an award of punitive damages is not prohibited by the LSA.

Count VI – Conversion:  nVision's Motion for Judgment on the Pleadings and Cardinal's Motion for Partial Summary Judgment regarding this claim were denied.  This claim will proceed to trial.

Count VII – Unjust Enrichment:  nVision's Motion for Judgment on the Pleadings regarding this claim was denied.  This claim will proceed to trial.

Count VIII – Equitable Estoppel:  nVision's Motion for Partial Summary Judgment and Second Motion for Partial Summary Judgment regarding this claim were denied.  The Court construes this mistakenly-designated counterclaim as an affirmative defense pursuant to Federal Rule of Civil Procedure 8(c)(2).  Cardinal may utilize the equitable estoppel affirmative defense at trial.

Count IX – Accounting:  Cardinal claims that "due to the complexity and volume of nVision's improper charges, the entire amount of money owed by nVision to Cardinal Health is unknown and cannot be ascertained without an accounting."  (Am. Countercl. ¶ 93).  Under Georgia law, a party may seek an equitable accounting in "[c]ases where accounts are complicated and intricate." O.C.G.A. § 23-2-70.  An accounting is generally unnecessary in a breach of contract action where a party may utilize the discovery process and, where necessary, orders of the court to enforce compliance with discovery obligations to determine the full amounts owed under the contract.  See Gifford v. Jackson, 154 S.E.2d 224, 225-26 (Ga. 1967) (valid breach of contract action and availability of discovery precludes resort to use of equitable accounting to determine potential damages); Ins. Ctr., Inc. v. Hamilton, 129 S.E.2d 801, 804 (Ga. 1963) (mere necessity of accounting to determine damages for breach of contract insufficient to warrant equitable accounting); Heath v. Sims, 531 S.E.2d 115, 117 (Ga. Ct. App. 2000); Faircloth v. A.L. Williams & Assocs., Inc., 465 S.E.2d 722, 723 (Ga. Ct. App. 1995); Forrest Villas Condo. Ass'n, Inc. v. Camerio, 422 S.E.2d 884, 887 (Ga. Ct. App. 1992).

Because neither party has addressed in its pretrial motions the necessity of an accounting and it appears that Cardinal has been able to determine the full

amounts owed to it by nVision in the course of discovery, the Court denies

Cardinal's request for an accounting.  <u>See</u> <u>Standard Bldg. Co., Inc. v. Schofield</u>

<u>Interior Contractors, Inc.</u>, 726 S.E.2d 760, 761-64 (Ga. Ct. App. 2012); <u>Alston &</u>

<u>Bird, LLP v. Mellon Ventures II, L.P.</u>, 706 S.E.2d 652, 646-48 (Ga. Ct. App.

2010).  The liability of the parties to each other will be determined at trial.

Count X – Costs and Expenses of Litigation:  Section 9 of the LSA does not

preclude Cardinal from seeking attorneys' fees as actual damages pursuant to

O.C.G.A. § 13-6-11.  However, Cardinal's recovery under O.C.G.A. § 13-6-11 is

limited.  In Georgia, a defendant may not recover litigation expenses pursuant to

O.C.G.A. § 13-6-11 when prosecuting a compulsory counterclaim.  <u>See, e.g.</u>,

O.C.G.A. § 13-6-11; <u>Eways v. Ga. R.R. Bank</u>, 806 F.2d 991, 993 (11th Cir. 1986);

<u>Homac Inc. v. Fort Wayne Mortg. Co.</u>, 577 F. Supp. 1065, 1072 (N.D. Ga. 1983);

<u>Sugarloaf Mills Ltd. P'ship of Ga. v. Record Town, Inc.</u>, 701 S.E.2d 881, 884 (Ga.

Ct. App. 2010); <u>Whitaker v. Hous. Cnty. Hosp. Auth.</u>, 613 S.E.2d 664, 668-69 (Ga.

Ct. App. 2005).  A defendant may only recover litigation expenses pursuant to

O.C.G.A. § 13-6-11 when it has pled and been successful in prosecuting a

counterclaim that is independent of the claims alleged by the plaintiff.  <u>See</u> <u>id.</u>[36]

---

[36] The Court notes that a party may not recover on both legal and equitable claims
and recovery on legal claims is generally limited to either contract or tort.  <u>See</u>
<u>McBride v. Life Ins. Co. of Va.</u>, 190 F. Supp. 2d 1366, 1378 (M.D. Ga. 2002)

## III.  CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Cardinal's Motion for Relief Under Rule 56(h) of the Federal Rules of Civil Procedure [192] is **DENIED**.

**IT IS FURTHER ORDERED** that Cardinal's Second Motion for Partial Summary Judgment [143] is **GRANTED IN PART** and **DENIED IN PART**.  It is **GRANTED** in favor of Cardinal on Cardinal's claim that (1) the number of self-

---

("[a]t trial the jury will be instructed that Plaintiff may recover on his fraud claim or unjust enrichment claim only if the jury finds that there was no breach of contract"); Original Appalachian Artworks, Inc. v. Schlaifer Nance & Co., 679 F. Supp. 1564, 1579 (N.D. Ga. 1987) (noting plaintiff may recover on its tort claims only if the jury finds that there was no breach of contract); Lee v. Shim, 713 S.E.2d 906, 913 (Ga. Ct. App. 2011) ("A plaintiff who has been successful on alternate contractual and tort remedies is required to elect its remedy.").  Additionally, while a party may pursue alternative and inconsistent remedies at trial, a party is not permitted to recover its actual damages multiple times on each alternative theory of relief.  See Marvin Nix Development Co. v. United Cmty. Bank, 692 S.E.2d 23, 25 (Ga. Ct. App. 2010) (quoting Flanigan v. Exec. Office Ctrs., Inc., 546 S.E.2d 559, 561 (Ga. Ct. App. 2001)) ("While a party may pursue inconsistent remedies, he 'is not permitted a double recovery of the same damages for the same wrong.  He is entitled to only one satisfaction of the same damages, in either contract or tort.'").  However, a party may recover at law on both a breach of contract claim and a fraud claim, to include punitive damages, where the fraud is not related to an inducement to enter the contract.  See Henderson v. Glen Oak, Inc., 351 S.E.2d 640, 641 (Ga. 1987); Woodhull v. Saibaba Corp., 507 S.E.2d 493, 497-98 (Ga. Ct. App. 1998) (damages that arise from fraud, other than a fraudulent inducement to enter a contract, are not duplicative of a breach of contract claim).  Accordingly, at trial, Cardinal will be required to elect its remedy if successful on multiple claims; may not recover its actual damages multiple times on each claim; and may recover on its fraud claim in addition to its breach of contract claim.

invoice courier transactions must be calculated at the stop level, not the order level; (2) nVision is not permitted to charge Cardinal for "flat file data feed" and "multiple line item data field" charges, or other charges that are not included in the LSA; and, (3) that Cardinal has not retained or used any of nVision's trade secrets or proprietary information; and **DENIED** on Cardinal's claim that it is entitled to equitable reformation of the agreement to reflect the parties' intended rate of $.02 per self-invoice courier transaction.

     **IT IS FURTHER ORDERED** that nVision's Second Motion for Partial Summary Judgment [148] is **DENIED**.

     **IT IS FURTHER ORDERED** that nVision's Renewed Motion for Summary Judgment on Cardinal's Counterclaims of Fraud and Estoppel [206] is **DENIED**.

     **SO ORDERED** this 14th day of August, 2012.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE